# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF KANSAS

| | |
|---|---|
| **Phillip Michael Eravi** | |
| Plaintiff | |
| v. | |
| **David McShane, in his individual capacity** * | |
| **Meagan Shipley, in her individual capacity** * | Case No.    5:24-cv-4042 |
| **Grant Foster, in his individual capacity** * | |
| **Austin Twite, in his individual capacity** * | |
| **The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas including the Lawrence City Police Department** | |
| Defendants | |

**VERIFIED COMPLAINT**

**INTRODUCTION**

1. This is a civil rights action seeking damages for the violation of the plaintiff Phillip Michael Eravi's First, Fourth, and Fourteenth Amendment rights, stemming from the Lawrence City Police Department officers' confrontation of Mr. Eravi in a public venue on private property of which the defendants improperly and deliberately escalated. They are overheard on their body cams saying they had "plausible deniability." Mr. Eravi's arrest was born of longstanding systemic bias in that police department towards citizen journalist Phillip Michael Eravi, well known in the Lawerence Kansas area for his civil activism and reporting of police activity.

1

2. This bias was kindling for the overblown confrontation by police in that early morning which ultimately led to a knee-jerk snap decision to arrest Mr. Eravi ultimately resulting in the police department scrambling to come up with many conflicting reasons for Mr. Eravi's arrest – including the fantastic notion that it was for his own safety.

3. But it was really because this plaintiff had been a long standing public irritant to this police force as a well-known citizen journalist who was doing what he routinely did – observe and video record law enforcement and a crime scene from a distance across the street from the crime scene.

4. This Complaint will show visual evidence taken from various body worn cameras that show Mr. Eravi was in a public forum, on private property, wanted to be left alone, continuing to walk casually, neither stopping nor breaking into a run that early morning.  Mr. Eravi was merely carrying his phone which was recording.  He did not carry any weapon of any kind.

5. Defendant City Officer McShane undertook his initial stop of Mr. Eravi on this private property without reasonable suspicion, and nothing during the stop created even arguable probable cause to arrest him for any offense under Kansas law.  Mr. Eravi was not trespassing.  There had been no complaints by the apartment owner(s) as to Mr. Eravi's presence on the front yard of an apartment complex property.

6. The reports made by the defendants and other City officers about this was sometimes speculative pushing a narrative not based upon any personal knowledge or observation, then contradictory, misleading, and off times wholly false,

7. The defendants found themselves in a shoot-first-aim-later conspiracy – they communicated with other defendants and City Officers to figure out what purported offense was committed by Mr. Eravi to support his arrest and prosecution.

8. The reports were falsified to cause and support Mr. Eravi's prosecution. Mr. Eravi was charged under K.S.A. 21-5904(a)(3) & (b)(5)(A) as "unlawfully, feloniously, and knowingly obstruct, resist, or oppose a person authorized by law to serve process, to-wit: David McShane and/or other Lawrence Police Officers, in the discharge of any official duty, in the case of a felony, a severity level 9 nonperson felony."

9. If found guilty Mr. Eravi faced a penalty range of a minimum of 5 months to a maximum of 17 months in prison and/or a fine of up to $100,000 and 12 months of post-release supervision.

10. Lawrence City Officers Meagan Shipley, Joshua Doncouse, Amaury Collado, Grant Foster, Steven Koenig, Nicholas Pate, Charles Smyser, Austin Twite, Adam Welch, Adam Zarnowiec, Hayden Fowler, and Noah Pena conspired to provide misleading false facts aimed at providing a false narrative justifying each defendant's actions as they described in their incident reports and testimony given in the Booking 23-01353 and case no. DG-2023-CR-000525.

11. Numerous reports of the Officers and defendants claim or connect the need to arrest Mr. Eravi so that Mr. Eravi would be "out of harm's way" or that Mr. Eravi "distracted" or drew their "attention" to Mr. Eravi. Defendant Twite falsely claimed to dispatch "that Phillip was not complying with commands" which was recited in Twite's incident report. Officer Welch falsely reported as fact in his report that Mr.

Eravi "had walked past perimeter patrol vehicles and was in an active crime scene. Eravi was then approached by officers of the Lawrence Police Department and ordered to leave. Eravi refused to leave…."

12. Officer Pate reported in his incident report that "officers approached him to make contact with him to direct him to leave the area as it was not safe" and that it "appeared the male was not cooperating with officers." Pate stated his "attention was divided."

13. Defendant McShane stated in his incident report that he "commanded him to stop" and that Mr. Eravi "ignored my commands and continued to walk." McShane claimed that "it was clear that several tactical officers were distracted and interfered with by Phillip's actions."  McShane claimed that he "offered several options for Phillip to leave the area but he refused to do." Defendant McShane may have only made suggestions but never gave any commands to Mr. Eravi prior to the decision to arrest him.

14. Major Fowler stated in his incident report that "there were marked LPD cars at multiple street locations, blocking access to the area where the suspect home was located, to keep people from entering" but this was not entirely true.  These LPD cars were parked at some intersections blocking car traffic in certain ways, none of the LPD cars blocked any access to pedestrian traffic.

15. Major Fowler participated in the arrest.  He shined a flashlight on Mr. Eravi's hands and took Mr. Eravi's cell phone.  At no time did Major Fowler intervene to stop the arrest but instead encouraged and assisted in it.

16. Major Fowler stated that defendant McShane "announced via the radio that Eravi was refusing to leave the area" which was untrue as McShane made no such orders and his radio message did not claim that.

17. Major Fowler falsely claimed that Mr. Eravi was "actively resisting officer's efforts" after being told he was under arrest but that was not true:  The moment Mr. Eravi was told he was under arrest there was no resistance from Mr. Eravi..

18. Defendant McShane falsely stated in his report Mr. Eravi "seemed to want [to] meander directly behind the tactical team" when in fact Mr. Eravi was walking away back South away from the tactical team prior to the arrest decision.  McShane falsely claimed that "I aired that Phillip would not leave the area" when in fact what he said was I "can't get him to move" which was also false.

19. Defendant McShane then reported that other officers were sent by defendant Shipley, not because Mr. Eravi was interfering with law enforcement activity, but instead "to assist moving Phillip out of harm's way."  But arresting Mr. Eravi over a bogus charge is not the means nor manner of persuading an individual to purportedly come out of "harm's way."

20. The pretextual "harm's way" narrative that the defendants and other officers continued.   Defendant Foster turned off his body cam camera prior to Fowler's interaction with Mr. Eravi.  But his comments were recorded by other officer's body cams. The statements made by Fowler, after Mr. Eravi was handcuffed and the arrest was completed, pretextually declare that the reason for Mr. Eravi's arrest was for his own safety and also not for disorderly conduct:

| | |
|---|---|
| Fowler | We have a safety issue for you. For your protection. |
| Eravi | So you attacked me for my safety? |
| Fowler | We tried to get you to leave the area. You refused |
| Eravi | You guys seriously attacked me for my own safety? |
| Fowler | Listen. Listen. Okay? Trying to talk. Let me talk. All right? We have a complex situation that is going on there. You're directly in the line of fire. |
| Fowler | For your safety we wanted to move you. |
| Eravi | For my safety. |
| Fowler | You refused to move. You refused to move. |
| Eravi | So all of this is about my safety. |
| Fowler | It is about your safety. |
| Eravi | Okay. I don't have anything else to say. Do what we're going to do. |
| Fowler | Okay. But I'm explaining to you. |
| Eravi | Do what we're going to do. |
| Fowler | For your safety, we asked you to move. You refused. |
| Eravi | All this is about my safety. I got it. |

21. Yet in Foster's incident report given after the arrest he pre-textually claimed other justifications for the arrest: "behavior proved distracting to officers working the scene; "Phillip's refusal to leave the area;" "McShane ordered Phillip to stop, but Phillip did follow Officer McShane's commands; "Phillip move back and forth and try to away from Officer McShane, and continue to ignore commands."

22. Foster goes so far as to cherry pick Mr. Eravi's statement in his report about safety out of context ("Yeah, well, I...I guarantee this ain't gonna be good, because you did all this for my own safety, is what you're telling me") – as though Mr. Eravi was admitting he was arrested for his own safety – which is not what Mr. Eravi was saying in sarcasm.

23. Defendant Foster provided a pretextual community-caretaking rationale. *Cady v. Dombrowski,* 413 U.S. 433, 441 (1973); *United States v. Ibarra*, 955 F.2d 1405, 1409 (10th Cir.1992).

24. And while these defendants do things to protect individuals and keep them safe, they never arrest individuals in order to keep that person "out of harm's way." Similarly situated individuals would not have been arrested. And if there was a probable cause basis, which the plaintiff avers there was not, to do so this was selective prosecution as to Mr. Eravi.

25. Mr. Eravi was not engaged in any apparent or actual criminal activity when defendant McShane confronted and stopped Mr. Eravi, and Mr. Eravi remained either on sidewalk or grass yard of the apartment complex – all of which was private property far from any parked vehicles.  Mr. Eravi did not appear nervous when McShane began asking him questions, nor did he make any attempt to flee the scene. Instead, Mr. Eravi remained calm, and despite McShane's aggressive questioning and intimidating proxemics, Mr. Eravi remained steady and walking filming the scene and the confrontation.

26. The facts do not demonstrate any reasonable suspicion of criminal activity on the part of Mr. Eravi yet the defendants each engaged in an unnecessary rapid escalation of force against him in the early morning hours of May 20, 2023, while on private property. Mr. Eravi's refusal to answer any or each of McShane's questions did not create a reasonable suspicion.  "A person approached by law enforcement is entitled to ignore his interrogator and walk away." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).  Not fleeing matters because "flight is different from merely walking or driving away." *Young v. Brady*,793 F. App'x 905, 912, n.4 (11th Cir. 2019).  *See also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Allowing officers confronted with such

flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning").

27. The facts, including photographic, audio, and video evidence from Mr. Eravi, as well as the defendants themselves, show numerous Lawrence Police policy violations which not only exposed Mr. Eravi to enhanced exposure to danger, but resulted in his physical and emotional injuries.

28. Defendants ignored Mr. Eravi's calm demeanors and explanations.  Instead, they unreasonably extended the stop and ultimately turned it into an unlawful arrest.

29. These facts will show that the actions taken by these defendants were intentional and retaliatory as a result of his prior publications about and contacts with the defendants and their City police force.

30.  Because of an absence of probable cause, any use of force was unreasonable.

31. Mr. Eravi plausibly alleges violations of clearly established Constitutional rights to be free from false arrest, malicious prosecution, and excessive use of force.

32. As Dr. Brent E. Turvey stated in his May 2024 report, after analyzing the facts of this arrest, "these types of retaliatory arrests are often referred to by law enforcement, in court rulings, and in the criminological literature as the imaginary crime of 'contempt of cop.'"

33. Plaintiff seeks compensation for the dignitary, economic, and emotional injuries he suffered as a result of the unlawful seizure and meritless charges brought against him. Plaintiff seeks punitive sanctions against the individual officers to punish them

for their callous disregard of his Constitutional rights and to deter them from this type of misconduct in the future.

## JURISDICTION AND VENUE

34. This civil rights action raises federal questions under the United States Constitution, particularly the First, Fourth, and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C.§ 1983.

35. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346, as this action challenges the defendants' violation of the plaintiff's civil rights pursuant to 42 U.S.C. § 1983.

36. Venue lies in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the event and omissions giving rise to the claims occurred in this judicial district.

## THE PARTIES

37. Plaintiff Phillip Michael Eravi is a natural person, citizen of Kansas, and legal resident of Douglas County, Kansas. Mr. Eravi is a citizen journalist who provides a valued source of information regarding local news and events, at a time when mainstream news organizations are increasingly disinterested or stretched thin to cover community news.

38. Mr. Eravi operates a YouTube channel, Lawrence Accountability, which audits and documents incidents related to the constitutionality of government employee conduct, such as a City of Lawrence staff, County prosecutors, and local law enforcement. This YouTube channel has been in operation since at least 2021.

39. Mr. Eravi has worked in cooperation with other media outlets and journalists to record and provide media coverage of issues relating to government corruption and police use of force, to include members of The Lawrence Times. https://www.aol.com/gladstone-hired-cop-left-op-191909437.html.

40. The media coverage afforded by Mr. Eravi is generally negative, focusing on issues related to misconduct and corruption by government officials and state agents, with an archive of reporting going back at least three years.

41. The Lawrence Police Department and the Prosecutor's Office have frequently been the focus of Mr. Eravi's reporting, as well as officials in local city government. Mr. Eravi's videos have each been viewed thousands of times or more.

42. The Lawrence City Commission, as the governing and legislative body of the City of Lawrence, Kansas. The Lawrence City Police Department is a department of the City of Lawrence, Kansas. The City of Lawrence was at all times relevant to this Complaint responsible for its employees, including the employees of Lawrence Police Department. The City of Lawrence is charged under the law with the duty of hiring, supervising, training, disciplining, and establishing policy such that the conduct of its employees will conform to the Constitutions and laws of the State of Kansas and of the United States of America.

43. At all times relevant to this cause, Defendant Officers either acted in conformance with policy pertaining to, among other things, investigation, arrests, and use of force, as set by Lawerence Police Policy, as well as acting within the course

and scope of their employment or did not act in conformance due to lack of training and oversight.

44.  Austin Twite was employed by the Lawrence City Police Department at the time described in this Complaint.  Defendant Twite has been in law enforcement and employed as a patrol officer since 2015.  Defendant Twite is sued in his individual capacity.

45. Grant Foster was employed by the Lawrence City Police Department at the time described in this Complaint.  Defendant Foster has been in law enforcement and employed as a patrol officer since 2021.  Defendant Foster is sued in his individual capacity.

46.  Meagan Shipley was employed by the Lawrence City Police Department at the time described in this Complaint.  Defendant Shipley has been in law enforcement and employed  since 2013 and currently a Sergeant.  Defendant Shipley is sued in her individual capacity.

47. David McShane was employed by the Lawrence City Police Department at the time described in this Complaint.  Defendant McShane has been in law enforcement and employed as a patrol officer since 2022.  Defendant McShane is sued in his individual capacity.

## MORE FACTS

48.  This incident occurred in the context of a law enforcement response to a shoot-out that started May 19, 2023, between neighbors; a subsequent active shooter situation; and an undefined /unsecured crime scene.

49. This incident also occurred in the context of a history of highly publicized negative agency media coverage as a citizen journalist by the plaintiff Phillip Michael Eravi.

50. It also occurred in the context of a prior complaint of excessive force by Mr. Eravi, against defendant Twite.  Defendant Twite was one of the officers who participated in the arrest of Mr. Eravi as alleged in this Complaint.

51. Prior to his arrest in the early morning hours of May 20, 2023, Mr. Eravi had multiple negative interactions with the defendants and other Officers of the Lawrence Police Department, documented on both his YouTube channel and by the local media.

52. Prior to his arrest on May 20, 2023, Mr. Eravi had filed a complaint against defendant Twite, one of the arresting officers at the scene, for excessive force.

53. At the scene of Mr. Eravi's arrest, he was recognized by appearance by defendants and other officers, and was referred to as "Mike" by one or more of the defendants.

54. On May 19, 2023, at approximately 10:37 p.m., the defendants responded to a reported shoot-out between neighbors in the 1900 block of Heatherwood Drive. This is a populated residential neighborhood, characterized by homes, an apartment complex, and related vehicle and pedestrian traffic.

55. Upon arrival, defendants determined that one person was injured and rendered aid.  They immediately came to believe that an armed shooter was inside of the home at 1951 Heatherwood Drive.

56. The Lawrence PD Critical Response Team (CRT) was deployed in response to their belief that an armed man was inside of the home at 1951 Heatherwood Drive.

Using an armored vehicle and communicating with a loudspeaker from his driveway, the CRT tried to persuade the suspect Joshua Townsend to give himself up.

57. Officers did not receive a reply. After waiting several hours, law enforcement entered this residence and apprehended Joshua Townsend, identified as the shooter, who was indeed armed.

58. As reported by City Officer Adam Welch: he "was briefed that the suspect, Joshua Townsend DOB [ ] was inside the residence of 1951 Heatherwood Drive, refusing to exit and was armed with a handgun and, who had earlier in the evening fired, several rounds at his neighbor who resided at 1943 Heatherwood Drive. R/O was also told Townsend had access to an AR-15 type rifle."

59. Officer Welch stated "R/O's main duty was to provide cover to all officers on the scene from the turret position of the armored vehicle, which was parked in the driveway of 1951 Heatherwood Drive, facing the opened garage door. R/O noted the interior door leading into the residence, from the garage was opened allowing R/O to view a few feet into the interior of 1951 Heatherwood Drive. Based on the information provided to R/O it was paramount that the opened garage door be covered at all times."

60. Mr. Eravi was across the street from the suspect's house on the private property of the apartments and was not near any area of approach for the police going towards the Suspect's residence.

61. Those living in the neighborhood were not evacuated, rather they were given an advisory to leave the area or shelter in place. However, a "sheltering in place" request

was made to occupants to stay inside.  Those residing in the apartment complex still remained directly in the line of fire from the suspect's residence.  This sheltering advisory also created the same problem for occupants in adjacent structures and vehicles.

62. Occupants behind a window in the apartments were no less at risk to actual bullet-penetration than if they were standing where Mr. Eravi was as glass or ½ sheet rock is not an effective shield to any caliber of weaponry.

63. Officer Welch's report reflects the seriousness of the situation, and the danger that was present in the neighborhood at the time. It also implies the corresponding duty of care with respect to protecting those living and moving around in the neighborhood.

64. The scene did not appear dangerous to Mr. Eravi because there were no police present when he approached and no scene security tape.  There were no defined and competently attended inner and outer security perimeters that were in place.  They did not exist.

65. There is an abundance of video evidence in this case to permit a jury to infer that the defendants used force after Mr. Eravi had already begun to comply with the defendants vague and confusing statements. If anything, the plethora of video evidence show that Mr. Eravi was told confusing and contradictory statements throughout.  On the night and morning in question, Mr. Eravi's presence as a citizen journalist immediately adjacent to apartment buildings across the street one-half football field length from a suspect's residence posed no threat to police.

66. In fact, Mr. Eravi was apparently arrested because he, according to the defendants, somehow posed a safety threat to himself by filming police and the area – and this because police continuously spotlighted him and created the very circumstance that drew attention to Mr. Eravi.

67. Mr. Eravi was arrested and suffered excessive use of force because it caused him to suffer some injury including bruising and psychological injuries.

68. At the time of the events in question, it was clearly established that a Lawrence City police officer may not use force on Mr. Eravi who is complying with a command. *See Newman v. Guedry*, 703 F.3d 757, 761-64 (5th Cir. 2012) (objectively unreasonable for officers to injure a man whose "behavior [does] not rise to the level of active resistance").

69. Mr. Eravi owns and operates "Lawrence Accountability," which is a local and independent media source focused on accountability and governmental oversight.

70. During the incidents described in this Complaint, Mr. Eravi legitimately functioned as "press" as that word is understood under the U.S. Constitution and the Kansas Bill of Rights Section 11.

71. Mr. Eravi is a constitutional activist, whose role in the community is that of an unafraid, law abiding, full-time witness to any possible malfeasance and abuse of governmental power.

72. He documents this with the goal of maintaining governmental and law enforcement accountability. Mr. Eravi started doing this important community work in 2020.

73. The defendants had pre-existing animus and bias towards Mr. Eravi as he has reported unflattering, unethical, and illegal activities of law enforcement including the Lawrence police department. Mr. Eravi has previously made a complaint against defendant Twite to his supervisors.

74. Mr. Eravi was detained by each of the defendants without reasonable suspicion and arrested without adequate probable cause that he had or was committing a crime. Mr. Eravi was walking in a public place, and without warning he was attacked and grabbed by police officers. Mr. Eravi was forcefully moved around by the defendant officers using pain compliance tactics for thirty seconds before he was even informed he was under arrest. Mr. Eravi was not committing any crime by walking on public or private property.

75. Mr. Eravi was not trespassing or acting unlawful and defendants did not have a reasonable suspicion to detain Mr. Eravi. There was no reasonable suspicion by any defendant that Mr. Eravi had any connection to the events occurring at 1951 Heatherwood Drive that night and early morning.

76. Mr. Eravi's purported lack of cooperation or lack of response to defendant McShane's statements or questions does not factor into any reasonable suspicion analysis. *Schreiner v. Hodge*, 315 Kan. 25, 504 P.3d 410, 419 (2022); *State v. Andrade-Reyes*, 309 Kan. 1048, 1057, 442 P.3d 111 (2019).

77. Mr. Eravi has a Fourth Amendment right to be free from an unreasonable stop or seizure. Defendant McShane's actions of saying that Mr. Eravi could walk and be

a "free man" conflicted with defendant McShane's actions of following, or what might be considered vaguely herding Mr. Eravi to an unknown destination.

78. Mr. Eravi was told by defendant McShane that he could walk and that he was a free man. Yet the same officer then suddenly, without notice or warning, then forcibly stopped, detained, and arrested him as Mr. Eravi had moved back South parallel to the private property of the apartment.

79. At approximately 10:40 p.m. on May 19th into the 20th, 2023, police were called out to the 1900 block of Heatherwood Drive in Lawrence, Kansas, to an alleged report of a neighbor, Joshua Townsend, allegedly shooting at another neighbor whose name is not listed in the police reports.

80. Defendant David McShane, the police department officer who arrested Mr. Eravi on May 20, 2023. Defendant McShane's last day on Lawrence Police Department was the next day – May 21, 2023.

81. Lawrence Police Officers reported that a "stand off" with Joshua Townsend sometime between 11:00 p.m. and 4:00 a.m. was occurring at or near 1951 Heatherwood Drive.

82. Mr. Eravi was out walking in an unmarked, un-perimeter, public place at the time. There was no so-called perimeter established by the Lawrence Police Department.

83. There were no officers present in the police vehicle on the South side from which Mr. Eravi approached, and no officers were present to instruct anyone from walking from the Southside Northward.

84. Mr. Eravi walked up to the unoccupied patrol car to ascertain what was happening. But the computer screen was blank.



85. Despite later claiming that the "officers were tasked with keeping citizens away from the immediate location for their own safety" there was no crime scene tape placed, nor was any visible, tangible, perimeter ever established at the scene by officers, other than the armored vehicle parked in the driveway of 1951 Heatherwood Drive.

86. Police did not provide any notice to the public or do anything, prior to Mr. Eravi's encounter, that indicated that foot traffic was no permitted where Mr. Eravi was walking.

87. An ariel view of the area is below:



88. The ariel describes the location of the initial exchange of gunfire and Joshua Townsend's residence. A police car blocked entry onto Heatherwood Drive but did not block pedestrian traffic on the East side sidewalk.



89. There was no pedestrian perimeter where Mr. Eravi was because defendants had not specifically contemplated pedestrian traffic adjacent to the apartment.

90. Not only was there no perimeter, it was the officers located at the Suspect's Residence that saw Mr. Eravi approach from the South. The responding officer McShane was located farther North on the street where the Initial Exchange of Gunfire is located on the map.



91. The ariel also depicts the approximate distance of 150 feet from where Mr. Eravi was confronted by Lawrence police. Mr. Eravi has been on numerous scenes, whether described as a crime scene, which is similar to this area and circumstance.

92. In those prior occasions where Mr. Eravi was present at a scene, he was not harassed, detained or arrested by police. Lawrence police officers know Mr. Eravi by sight, who he is, and what he does to attempt to help the community.

93. Yet defendant McShane asked Mr. Eravi "what's your name?"

94. The entire walk Mr. Eravi took that night up Heatherwood Drive was completely open to the public, with no visible blockade or barriers.



95. Defendant McShane's Axon body cam begins at the point where he yells at Mr. Eravi at 1:53 a.m. Defendant McShane reported that he "took a perimeter position to the south of 1951 Heatherwood in the backyard of 2007 Heatherwood Drive, until [he] was relieved by tactical officers."

96. Defendant Seargent Megan Shipley arrived on scene at approximately 11:43 p.m., and was assigned the task of team leader for the "contact team" that deployed outside of an armored vehicle that was parked in the driveway of the Townsend residence. Defendant Shipley reported that "we deployed to the outside of the armored vehicle at approximately 1:10 a.m."

97. At 1:43 a.m. Lieutenant Mark Unruh instructed two officers to suggest people in the apartment across the street "shelter in place" or leave – but did not require the officers to order either of those two suggestions:

Unruh "Anybody that's in direct line with that, can you just knock on the door and let them know, Hey, we got an incident going on. We're worried about the potential of gunfire. We would advise that you probably leave for the night. And that they need to leave out that way and then go all the way down. But if they're going to shelter in place, then they're going to shelter in place. Can you do that for me?"

98. Defendant Shipley reported that the armored vehicle was  used "to protect people from bullets." Another Lawrence officer, Seargent Ashley, called out on the PA system for Mr. Townsend to exit the residence.

99. Major Hayden Fowler was the highest ranking officer at the scene who knew who Mr. Eravi was by sight.  Fowler was familiar with Mr. Eravi as being often present and reporting on police incidents.  Fowler informed the officers that it was Mr. Eravi. Fowler saw Mr. Eravi walking northbound and was able, and did, observe all of the walking movements of Mr. Eravi.

100. According to her report, at approximately 1:53 a.m. on May 20, 2023, defendant Shipley saw a subject whom she recognized as Mr. Eravi walking northbound in the 2000 block of Heatherwood Drive on the east side of the sidewalk holding his phone recording which is opposite from the side where she was behind the armored vehicle parked in the Townsend's driveway.  Defendant Shipley was able to and did observe all of the movements of Mr. Eravi.

101. The below graphic shows in green where Mr. Eravi was walking.  It turns to yellow where Mr. Eravi is spotlighted by defendant McShane.  The red dot is the point

that defendant McShane first makes physical contact with Mr. Eravi. The blue line indicates the Douglas County Sheriff's office vehicle arriving with CRT members inside, as McShane and Foster were grabbing Mr. Eravi and joined in as he moved South. The CRT members were already walking South when Mr. Eravi was at the top on the red line. but that did not occur until after Mr. Eravi was arrested which is indicated at the top of the red line.



102. Defendant Shipley was able to, and did in fact, personally observe all of Mr. Eravi's walking movement in front of the apartment that late evening and early

morning. Defendant Shipley had no need to rely upon Defendant McShane's descriptions of Mr. Eravi "not moving" when Defendant Shipley personally witnessed that Mr. Eravi was moving and in fact moving back South parallel close to the apartment complex's private property. at the time when she made her order to arrest Mr. Eravi.

103. As Mr. Eravi walked Northward two individuals appear in the distance.



104. Then one individual turns a light on as Mr. Eravi approaches the sidewalk entrance to the apartments.  Mr. Eravi continues walking Northward on the sidewalk.  The light goes off.



105. As Mr. Eravi reaches the apartment sidewalk entrance, the light is back on:



106. Mr. Eravi continued walking North and reached the second apartment approach

where he turns towards the apartment doors:



107. The dialogue from the green-to-yellow point to the red dot as Mr. Eravi walked

North was as follows:

| McShane | (00:29): | Hey. Stop right there. Gotcha. Watch that. |
|---|---|---|
| Eravi | (00:49): | Get your lights out of my eye. |
| McShane | (00:57): | No, come on. You can't be right here. |
| Eravi | (01:00): | What? |
| McShane | (01:00): | Who are you? |
| Eravi | (01:01): | There's no... |
| McShane | (01:02): | Come on. |
| Eravi | (01:02): | There's no lines. |
| McShane | (01:03): | Keep an eye on that for me. |

108. Even though Unruh was careful to inform neighbors not to turn on lights when

officers approached, or for officers not to be in the light, all for officer safety, the same

safety precautions didn't apply to Mr. Eravi.  At the green to yellow point, defendant

McShane spotlighted Mr. Eravi which, if Mr. Eravi's purported risk of being shot at

from the Suspect Residence increased and did not increase:



109. At the red dot, defendant McShane makes physical contact with Mr. Eravi.



110.  Both officers approached, one looks away, and defendant McShane has his right

hand positioned:



111. Mr. Eravi attempted to put distance between himself and the defendant McShane walking East towards the apartments as indicated by the yellow line.  Mr. Eravi then headed North parallel close to the apartment building and then turns around and heads South depicted in the graphic.  As Mr. Eravi was walking away from the Suspect Residence McShane has misrepresented to his supervisor defendant Shipley that Mr. Eravi is "not moving" and is in front of the police armored vehicle located at the Suspect Residence.  The dialogue from the red dot where defendant McShane physically contacted Mr. Eravi till was walking back South to the beginning of the red line was as follows:

| Eravi | (01:04): | Don't touch me. |
|---|---|---|
| McShane | (01:05): | If you want to walk, walk. But I have to cover you. Let's go. |
| Eravi | (01:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (01:16): | You live here? |
| Eravi | (01:16): | You need to leave me alone. |
| McShane | (01:19): | Come on. Just get inside if you live here. |
| Eravi | (01:20): | You need to leave me alone. |
| McShane | (01:21): | Sir, I need you to leave. |
| Eravi | (01:23): | You need to leave me alone. |
| McShane | (01:24): | I will. Just keep walking. |
| Eravi | (01:27): | I'm a free human being. You need to leave me alone. |
| McShane | (01:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (01:30): | Leave me alone. |
| McShane | (01:30): | I'll walk with you. |
| Eravi | (01:31): | Leave me alone. |
| McShane | (01:34): | I can't get him to move. |
| Eravi | (01:37): | You motherfuckers woke me up. Leave me alone. You woke me up. |
| McShane | (01:39): | What's your name? |
| Eravi | (01:40): | You woke me up. You got me out here. Leave me alone. |
| McShane | (01:42): | Okay. Come on. |
| Eravi | (01:43): | Get off me, dude. |

112. And despite claiming this purported purpose was only "safety" the defendant officers later pretextually claimed there was a different purpose – that they were attempting "service of process."

113. Defendant Twite reported that "Officer McShane and Officer Foster approached" Mr. Eravi. Defendant Twite falsely reported that both were speaking with Mr. Eravi when only one officer had. Defendant Twite falsely reported that both ("they") said Mr. Eravi "was not complying with commands" when no commands had been given to Mr. Eravi by either. In his report, defendant Twite falsely reported that both reported to "dispatch" claiming Mr. Eravi was not complying with commands when the actual verbiage was "I can't get him to move."

114. Mr. Eravi walks North to the end of the apartment building where a police vehicle is parked with no lights and no emergency lights.



115. In defendant Foster's report he  claimed that "Officer McShane ordered [Mr. Eravi] to stop" while nothing spoken by defendant McShane after that initial confrontation and prior to the arrest, could be reasonably understood as an ongoing command to Mr. Eravi to stop walking.

116. As Mr. Eravi walked back to the South he looked over at the individuals at the armed vehicle:



117. In defendant Shipley's report, she stated that "I informed Officer McShane that Eravi could not stand behind the armor" and that defendant McShane stated Mr. Eravi "was not listening." Defendant Shipley then stated she told defendant McShane to arrest Mr. Eravi.

118. Mr. Eravi turned around and headed back South and another unlit parked police vehicle was located on the other side of the street:



119. But the joint communications involving Lieutenant Mark Unruh, defendant McShane, and defendant Shipley indicate that Lieutenant Unruh said to "detain" and not arrest Mr. Eravi according to Unruh's body cam video:

> Unruh Yeah, we got units going down there to make contact.
> Shipley Okay, he's continuing to come closer.
> Unruh Yep, we got guys right there walking towards him. I don't know if that's our subject or not.
> Shipley He can't be right behind the armor.
> McShane I can't get him to move.
> SHIPLEY: ..Just arrest him
> Unruh Go ahead and detain him.
> ***
> Unruh The team is showing up.. What the fuck was that over there?
> Gross I didn't see who it was, I think it might have been Eravi
> Pate It was Eravi [inaudible 02:56:18].

120. Defendant Shipley later testified she did not hear her superior Lt. Unruh say to detain Mr. Eravi and further testified that even if she had heard this command she would have overridden Lt. Unruh's detain command.

121. Despite being told by Lt. Unruh to merely detain Mr. Eravi, defendant McShane ignored that command and arrested Mr. Eravi.

122. Defendant McShane falsely claimed in his report that he told Mr. Eravi he could "continue walking through to the north" and then characterized the area not as dangerous but merely a "potential dangerous areas."

123. Sgt. Shipley and Officer McShane both made reports that "neighboring residents had been evacuated or told to shelter in place due to danger to the public" although this was not true if "told" means commanded as the statements were merely suggestions and none of the police body cams substantiate those claims.

124. At no time was Mr. Eravi advised by any Lawrence police officer that he was in danger, in a crime scene perimeter, that police were attempting process of service, or that there was any likelihood of shots being fired.

125. Defendant McShane's body cam footage that was provided to Mr. Eravi was only eight minutes and 35 seconds which appears to be incomplete.

126. Defendant McShane told Mr. Eravi he could walk and to just keep walking, but that McShane would assure Mr. Eravi's police protection and safety  -- McShane would act as Mr. Eravi's protective shepherd (i.e. "cover him") indicating Mr. Eravi was still free to walk and would be escorted and always protected by that officer.  This was "a specific promise or representation by the officer." *See Taylor v. Phelan*, 9 F.3d 882, 885 (10th Cir. 1993) ("by assuring the Taylors of their safety pending the arrest, the Missouri police made specific promises justifying reliance by the Taylors"); *Hendrix v. City of Topeka*, 231 Kan. 113, 137, 643 P.2d 129 (1982) ("Liability against

33

a police officer may be predicated upon breach of specific promises or representations such as failure to provide promised protection").

127. This affirmative statement coupled with defendant McShane's actions imputed a "special duty" upon defendant McShane to recognize Mr. Eravi's Constitutional rights to walk in public areas, film police or other areas, conduct himself as press to inform the public, as well as clearly articulate to Mr. Eravi exactly how, where, and why Mr. Eravi could be present or not present – which defendant McShane breached that special duty and was negligent in so doing.

128. McShane's promise and actions increased the risk of injury to Mr. Eravi via being shot or arrested by spotlighting him continuously, continuously drawing attention to Mr. Eravi, and then failing to accurately communicate Mr. Eravi's actions which led to his battery, assault, arrest, and subsequent physical injuries.

129. In fact, all of the claimed "distractions" by the defendants only came after the decision was made to arrest Mr. Eravi and his actual arrest.  No officers were "distracted" or hindered from performing any official duty by Mr. Eravi's presence prior to his improper detention and arrest.

130. Moreover, this special duty upon defendant McShane required him to accurately convey to his supervisor defendant Shipley exactly what Mr. Eravi was doing in terms of his direction of travel and responses to defendant McShane – which defendant McShane was negligent in so doing.

131. The breach of this special duty by the defendant McShane caused Mr. Eravi's actions to be misconstrued by defendant Shipley, then falsely arrested and injured during the arrest.

132. Defendants admitted that Mr. Eravi was told that "he was free to walk through the area" – despite purportedly later claiming (and did not say to Mr. Eravi) that doing so would place Mr. Eravi "in the line of fire" and placed Mr. Eravi "in harm's way." Defendants also later claimed that Mr. Eravi was free to walk as long as he would be "covered by an officer if he wanted to do so" and then claimed Mr. Eravi was told he "could not linger in the immediate vicinity."

133. Defendants admitted that Mr. Eravi "was free to remain in the general area" yet arrested him for being in the general area.

134. Mr. Eravi was not in the immediate vicinity of an armed standoff being where he was located.

135. Defendant McShane never told Mr. Eravi of a specific location where he "could linger."

136. Mr. Eravi never prevented any of the defendant officers from performing their official duties related to the 1951 Heatherwood Drive location at that time.

137. Mr. Eravi told defendant McShane he did not need to be covered. Defendant McShane then told Mr. Eravi he needed to leave, but never told him why, or that he was in any perimeter, crime scene, or that he was in any danger.

138. Mr. Eravi told defendant McShane that he was a free human being and defendant McShane agreed with him. Mr. Eravi reasonably believed that defendant

McShane was communicating to him that Mr. Eravi was free to be where he was and was free to walk with his telephone.

139. Defendant McShane then falsely reported to other officers that he "can't get him to move" but Mr. Eravi was continuously moving.



140. Defendant McShane reported that Mr. Eravi was moving: "ignored my commands and continued to walk." Yet, defendant McShane later said to "just keep walking" so which statement was Mr. Eravi supposedly not complying with?

141. In fact, Mr. Eravi was moving away from defendant McShane and was, at the time, walking South further away from 2000 Heatherwood from where McShane originally confronted Mr. Eravi.

142. Defendant McShane reported to the command post that Mr. Eravi was located in front of 1925 Heatherwood Drive as though Mr. Eravi was near when in fact he

was across the street some 150 feet away in front of apartment buildings across the street from the Suspect Residence.

143. Defendants falsely claimed that Mr. Eravi "refused to comply" with defendant McShane's "order to evacuate the immediate vicinity."

144. According to the defendant Shipley, Mr. Eravi was arrested because he stood behind the armor or for not listening.  Defendant Shipley stated in a report that "I informed Officer McShane that Eravi could not stand behind the armor. Officer McShane advised Eravi was not listening. I informed Officer McShane to arrest Eravi."

145. Even as defendant McShane was again falsely reporting to defendant Shipley that he "can't get him to move" Mr. Eravi had constantly been moving and was in fact walking South making no movements towards the Suspect Residence:



146. Mr. Eravi continues to walk South making no movements towards the Suspect Residence followed by defendant McShane. It also demonstrates defendant McShane continued to light himself up as well as another officer standing out in the open:



147. Despite walking back South defendant McShane does not inform defendant Shipley of Mr. Eravi's continual movement and particularly his movement South. Based upon the false, misleading, and incomplete information from defendant McShane to defendant Seargent Meagan Shipley, defendant Shipley instructed defendant McShane to arrest Mr. Eravi as Mr. Eravi was walking South.

148. Defendants falsely claimed that Mr. Eravi "attempted to walk directly across from the residence."  The physical contact and timing of the detention of Mr. Eravi is depicted approximately below:



149. Mr. Eravi had a previous incident with Officer Twite in which defendant Twite assaulted and battered Mr. Eravi. Defendant McShane, Foster, Twite, then physically restrained Mr. Eravi which caused injury and pain to Mr. Eravi. Mr. Eravi repeatedly visibly and orally expressed pain where the defendants were each intentionally using techniques that were purposeful to cause Mr. Eravi pain including body and neck restraints, bending of the wrists and twisting of Mr. Eravi's fingers.

150. Defendants deliberately inflicted severe pain upon Mr. Eravi.

151. Mr. Eravi asked them why these defendant officers Twite, McShane, Foster, and Fowler were "roughing" him up. None of those defendants explained to Mr. Eravi that he was being detained or arrested at that time.

152. Later, when the defendants do tell Mr. Eravi he was being detained and arrested, Mr. Eravi complied although Mr. Eravi has no idea as to why he was being arrested and tells the officers that.

153. More dialogue with Mr. Eravi and defendants occurred:

| McShane | (01:44): | Let's go. |
| Eravi | (01:45): | Hey. Why are grabbing? |
| McShane | (01:46): | Let's go. |
| Eravi | (01:46): | Why are you fucking roughing me up, motherfucker? |
| McShane | (01:49): | Come on. Let's go. |
| Eravi | (01:50): | Why are you roughing me up, motherfucker? |
| McShane | (01:50): | Because [inaudible]. Hey. |
| Eravi | (01:53): | Hey. You dude can't be roughing me up like this. |
| McShane | (01:56): | Let's get him out in front of the house. |
| Eravi | (01:56): | What the fuck? |

| | | |
|---|---|---|
| McShane | (01:57): | I'm not roughing you up. Let's go. |
| Eravi | (01:59): | Hey, man. Get the [02:00] fuck off me, man. I'm a |

free fucking human. Get the fuck off me. What's your name? Your name.

| | | |
|---|---|---|
| McShane | (02:07): | Come on. |
| Eravi | (02:07): | What is your fucking name? |
| McShane | (02:09): | We're almost there. |
| Eravi | (02:09): | What are your fucking names? |
| Zarnowiec | (02:09): | It's Zarnowiec. Just chill, man. Chill. |
| Eravi | (02:09): | Who's this? Who [inaudible 02:10] got a hold of |

me. Hey, who the fuck are you?

| | | |
|---|---|---|
| Zarnowiec | (02:09): | Stop. Mike. |
| Eravi | (02:09): | Name. |
| Zarnowiec | (02:09): | You're under arrest right now. |
| Eravi | (02:19): | Name. |
| Zarnowiec | (02:19): | Okay? |
| McShane | (02:19): | It's Officer McShane. |
| Eravi | (02:20): | Name. |
| Zarnowiec | (02:20): | Put your hands behind your back. Okay? |
| Eravi | (02:21): | Why am I under arrest? |
| Foster | (02:22): | For interfering, Mike. |
| Eravi | (02:26): | Dude, you guys fucking woke me up in the middle |

of the fucking night.

| | | |
|---|---|---|
| Zarnowiec | (02:29): | I just [00:02:30] pulled up to this, man. |
| Eravi | (02:30): | With all your fucking sirens and shit, dude. |
| Zarnowiec | (02:32): | All I know is they said that you're under arrest for |

interfering.

| | | |
|---|---|---|
| Eravi | (02:33): | Ow! |
| Twite | (02:33): | Quite fightin man, you're gonna get hurt. |
| Eravi | (02:36): | Can you tell him to not fucking... Ow! |
| Zarnowiec | (02:38): | Yeah, but you need to stop fighting. |
| Eravi | (02:39): | He's ripping my finger apart. Bending my wrist. |
| Zarnowiec | (02:42): | Just relax. Be quiet. |
| Eravi | (02:43): | There's no reason for all that. |
| Zarnowiec | (02:44): | Well, I saw you fighting, man. I saw you. |
| Eravi | (02:46): | I wasn't fighting, dude. |
| Zarnowiec | (02:47): | You were. |
| Eravi | (02:47): | They grabbed me. |
| Zarnowiec | (02:48): | I could see your [inaudible 02:50]. |
| McShane | (02:49): | [inaudible 02:50]. |
| Zarnowiec | (02:50): | Green sweatshirt, man. |
| Eravi | (02:51): | They grabbed all over me, man. |
| Zarnowiec | (02:53): | Hey, Mike. |
| McShane | (02:53): | You okay? [inaudible 02:54]. |
| Eravi | (02:53): | McShane and who? |
| McShane | (02:56): | Just me. |
| Eravi | (02:57): | Foster. |

154. Fowler told Mr. Eravi this was all "about your safety" and that Mr. Eravi "refused to move" which was false:

41

| Fowler | (05:04): | I'm going to explain to you what's going on. |
| Eravi | (05:06): | You guys attacked me for no reason. |
| Fowler | (05:07): | We have a safety issue for you. For your protection. |
| Eravi | (05:12): | So, you attacked me for my safety? |
| Fowler | (05:14): | We tried to get you to leave the area. You refused. |
| Eravi | (05:15): | You guys seriously attacked me for my own safety? |
| Fowler | (05:18): | Listen. Listen. Okay? Trying to talk. Let me talk. All right? We have a complex situation that is going on there. You're directly in the line of fire. |
| Eravi | (05:28): | Okay. |
| Fowler | (05:29): | For your safety we wanted to move you. |
| Eravi | (05:30): | For my safety. |
| Fowler | (05:30): | You refused to move. You refused to move. |
| Eravi | (05:33): | So, all of this is about my safety. |
| Fowler | (05:34): | It is about your safety. |
| Eravi | (05:41): | Okay. I don't have anything else to say. Do what we're going to do. |
| Fowler | (05:41): | Okay. But I'm explaining to you. |
| Eravi | (05:41): | Do what we're going to do. |
| Fowler | (05:41): | For your safety, we asked you to move. You refused. |
| Eravi | (05:43): | All this is about my safety. I got it. |

155. So despite defendant McShane informing Mr. Eravi that he could walk keep walking and that defendant McShane would "cover him" Mr. Eravi did, in fact, walk and keep walking and at the time of the arrest was moving away South from the Suspect's Residence.

156. Defendants McShane, Foster, Twite then say Mr. Eravi was being arrested for "interference" – yet other individuals at the location were outside, walking around, some walking with their dogs, yet only Mr. Eravi was confronted and arrested.

157. No purported "service of process" to anyone was occurring at the time Mr. Eravi was confronted and later arrested.

158. At the time Mr. Eravi was arrested defendant Shipley was not wearing the CRT helmet cam, which, according to police protocol and training, defendant Shipley would need for contact with and service to Townsend.

159. Townsend was not contacted by police and removed from his residence until approximately 4:00 a.m. on May 20, 2024.

160. On May 28, 2023, Sgt. Megan Shipley filed a signed and sworn Affidavit alleging misleading or false facts to charge Mr. Eravi with felony interference.

161. In paragraph 3 of the affidavit Sgt. Shipley swears that "during the alleged incident" the Lawrence Police Department obtained a signed lawful search warrant to enter the residence of 1951 Heatherwood Drive.

162. Sgt. Shipley materially omits that her team was in no way ready to serve the warrant prior to Mr. Eravi's arrest. In fact, the warrant wasn't attempted to be served until well after Mr. Eravi had already been arrested.

163. In paragraph 4, Sgt. Shipley swears that "Officers took precautions by evacuating neighbors and or advising them to shelter in place" but at no time was this made a requirement subjecting those residents to arrest if they did not do so.

164. Sgt. Shipley swore that "a marked Lawrence Police Department Vehicle with illuminated overhead emergency lights was parked on Heatherwood Drive, south of the address blocking traffic to prevent vehicles or pedestrians from traveling north. These precautions were in place to reduce and prevent anyone from entering the area in case of an unfortunate incident of gunfire." This statement is a materially false statement.

165. No police vehicle was blocking traffic or pedestrians from traveling north. No precautions were in place to prevent anyone from entering the area.   There was

absolutely no perimeter established and Mr. Eravi was free to walk without obstruction to the area where Mr. Eravi was ultimately arrested.

166. In paragraph 7 of her affidavit, Sgt. Shipley falsely claims that Officer McShane illuminated Eravi with his flashlight and commanded him to stop.  She swears that Mr. Eravi ignored Officer McShane's commands and continued to walk directly across from 1951 Heatherwood Drive where officers were attempting to serve a search warrant to enter the residence and contact the individual involved yet omits that McShane had later told Mr. Eravi to keep walking.

167. These statement are false and misleading.  There was no search warrant that was attempted to be served at that time. The statement omits that defendant McShane told Mr. Eravi that if he wanted to walk, he could walk, that Officer McShane agreed that Mr. Eravi was a free human, and that Officer McShane said he would leave Mr. Eravi alone.

168. Defendant Shipley omitted that Mr. Eravi was never told he was in a danger zone, that there was a risk of gun fire or any heightened risk whatsoever. Instead, Sgt. Shipley swore in paragraph 8 that "Eravi placed himself in harm's way" even though Mr. Eravi had no notice of any alleged "harm's way" and which defendant Shipley claimed Mr. Eravi was actually behind the police department's armored vehicle, which, if true, was likely the most safe place to be at that address.

169. In paragraph 8 defendant Shipley falsely claimed that "Officer McShane offered for Eravi to enter the actual apartment complex itself simply continue walking to the north, out of and potential dangerous areas."

170. The affidavit omits that defendant McShane told Mr. Eravi that he agreed that Mr. Eravi was a free man, McShane would walk with Mr. Eravi, that McShane told Mr. Eravi he would leave Mr. Eravi alone, and only asked Mr. Eravi to keep walking.

171. In paragraph 9 of the affidavit defendant Shipley swears that she informed Officer McShane that Mr. Eravi could not be located behind the police department's armored vehicle. Sgt Shipley materially omits that. Mr. Eravi was not standing directly behind the armored vehicle, he was across the street and several yards away, and he was not standing still, he was moving. Sgt. Shipley swears that she gave Officer McShane the order to arrest Eravi, but she was not fully informed as to what actually was taking place. Furthermore, she materially omits that her commanding officer gave the order to detain Mr. Eravi, after her order to arrest, which should have trumped her order.

172. In paragraph 10, Sgt. Shipley swears that McShane used force compliance techniques too, and that Eravi "actively resisted" this use of force. Sgt. Shipley materially omits that no officer, including McShane. communicated to Mr. Eravi that he was being arrested at that time and that it wasn't until 30 seconds later that Mr. Eravi was informed that he was being arrested.

173. In paragraph 11, Sgt Shipley discusses a canine partner named Shadow, with handler, Officer Doncouse and how Shadow reacted to Mr. Eravi's illegal and unannounced arrest. Sgt. Shipley materially omitted that Shadow had been acting up prior to this and further that there was a woman walking her dog at this time nearby as well.

45

174. At paragraph 13 Sgt Shipley swears that around 3:00, well after Mr. Eravi was arrested and taken to jail, that "two other parties attempting to film Officers Actions directly across from the involved residence." Sgt Shipley stated how Officer McShane explained the situation to the parties, and how their location was not safe. Sgt. Shipley materially omitted from the affidavit that no officer, including Officer McShane ever "explained the situation" to Mr. Eravi and how the location "was not safe" to Mr. Eravi.

175. Defendant Twite had previously confronted and abused Mr. Eravi when Mr. Eravi was about to be released from handcuffs, Mr. Eravi stood staring directly at and in front of the defendant Twite. While Mr. Eravi was handcuffed, and without any justification, defendant Twite pushed Mr. Eravi backwards.

176. As a result of this encounter, false affidavit, and arrest, Mr. Eravi was charged with a level 9 nonperson felony citing K.S.A. 21-5904(a)(3) & (b)(5)(A). Mr. Eravi did not knowingly obstruct, resist, or oppose a person authorized by law to serve process. But as previously stated, defendant McShane was not serving process when he confronted Mr. Eravi, and such reasons are pretextual to the real reason why Mr. Eravi was detained and arrested.

# FIRST CAUSE OF ACTION
### PRIOR RESTRAINT AND RETALIATORY POLICY OF PROHIBITING THE  EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (MONELL LIABILITY CITY OF LAWRENCE)

177. Plaintiff Mr. Eravi repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

178. Mr. Eravi was engaged in First Amendment protected activities at all times as referred to in this Complaint. The First Amendment protects the right to photograph, to record matters of public interest, observe governmental operations, and even the commission of a crime. *See Project Veritas v. Schmidt,* 72 F.4th 1043, 1065 (9th Cir. 2023). Video recording is unambiguously speech-creation and not mere conduct. *Irizarry v. Yehia,* 38 F.4th 1282, 1292 (10th Cir. 2022).

179. Plaintiff Eravi was video recording at all times in a public forum, and then on private property accessible to the public.

180. There was a clearly established right to record police officers in public places as of May 2020.

181. The Lawrence Police Department Policy functions as a prior restraint to protected speech, is biased against the exercise of protected speech, and builds into the Department systemic malice and prejudice to individuals who photograph or videotape police activities.

182. The Policy does not target or similarly limit individuals who witness, without recording, the same police presence or activities. But if the citizen is recording police

presence and activities, the Policy empowers its officers to engage in limiting First Amendment conduct simply because the citizen is recording.

183. Pursuant to the Lawrence Police Department Policy Manual 425.3 ("RECORDING LAW ENFORCEMENT ACTIVITY") it states:

Members of the public who wish to record law enforcement activities are limited only in certain aspects.
(a) Recordings may be made from any public place or any private property where the individual has the legal right to be present.
(b) Beyond the act of photographing or recording, individuals may not interfere with the law enforcement activity. Examples of interference include, but are not limited to:
1. Tampering with a witness or suspect.
2. Inciting others to violate the law.
3. Being so close to the activity as to present a clear safety hazard to the officers.
4. Being so close to the activity as to interfere with an officer's effective communication with a suspect or witness.
(c) The individual may not present an undue safety risk to the officer, him/herself or others.

184. Policy 425.4 ("OFFICER RESPONSE") states:

Officers should request that a supervisor respond to the scene whenever it appears that anyone recording activities may be interfering with an investigation or it is believed that the recording may be evidence. If practicable, officers should wait for the supervisor to arrive before taking enforcement action or seizing any cameras or recording media. Whenever practicable, officers or supervisors should give clear and concise warnings to individuals who are conducting themselves in a manner that would cause their recording or behavior to be unlawful. Accompanying the warnings should be clear directions on what an individual can do to be compliant; directions should be specific enough to allow compliance. For example, rather than directing an individual to clear the area, an officer could advise the person that he/she may continue observing and recording from the sidewalk across the street. If an arrest or other significant enforcement activity is taken as the result of a recording that interferes with law enforcement activity, officers shall document in a report the nature and extent of the interference or other unlawful behavior and the warnings that were issued.

185. Policy 425.5 ("SUPERVISOR RESPONSIBILITIES") states:

A supervisor should respond to the scene when requested or any time the circumstance indicates a likelihood of interference with a crime scene, investigation or other unlawful behavior.

The supervisor should review the situation with the officer and:

(a) Request any additional assistance as needed to ensure a safe environment.

(b) Take a lead role in communicating with individuals who are observing or recording regarding any appropriate limitations on their location or behavior. When practical, the encounter should be recorded.

(c) When practicable, allow adequate time for individuals to respond to requests for a change of location or behavior.

(d) Ensure that any enforcement, seizure or other actions are consistent with this policy and constitutional and state law.

(e) Explain alternatives for individuals who wish to express concern about the conduct of department members, such as how and where to file a complaint.

186. The defendants failed to follow their own policy. The Policy specifically contemplates recording from a "sidewalk across the street."   Yet defendants apparently, and unknown to Mr. Eravi, moved to "clear the area" rather than the defendants advising Mr. Eravi "that he/she may continue observing and recording from the sidewalk across the street."

187. Plaintiff Eravi did not interfere with any City Officer's effective communication with a suspect or witness.

188. Plaintiff did not present an undue safety risk to any City Officer.

189. Defendants did not give clear and concise warnings to Mr. Eravi.  Defendants did not warn Mr. Eravi that he would be arrested.

190. The "most heinous act in which a democratic government can engage is to use its law enforcement machinery for political ends." *Gonzalez v. Trevino*, 60 F. 4th 906, 907 (5th Cir 2023).   "Here in America, we do not arrest our political opponents." *Frenchko v. Monroe*, No. 4:23-CV-781, 2023 WL 9249834 at *1 (N.D. Ohio Jan. 16, 2023).

191. Each defendant has targeted Mr. Eravi because of his status and viewpoints and have been motivated from their respective animosity and predispositions against Mr. Eravi and his political viewpoints as a basis to retaliate and chill Mr. Eravi' speech.

192. Each defendant was "motivated by improper considerations" such as "the desire to prevent the exercise of a constitutional right." *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000).

193. Defendants singled out Mr. Eravi from being present on private property when the defendants allowed other individuals to be present on the same private property.

194. "Singling out one individual, banning his (perhaps disfavored) speech, and essentially preventing him from engaging in a form of civil discourse that is available to everyone else ... is unreasonable." *McBreairty v. Sch. Bd. of RSU 22*, 616 F.Supp.3d 79, 96 (D. Me. July 20, 2022).

195. The defendants each ratified each confrontation, removal(s), and arrest of Mr. Eravi on private property.  Each made an affirmative approval of those decisions of the defendants described in this Complaint. Each defendant further ratified those decisions by failing to meaningfully investigate and punish the unconstitutional conduct.

196. An inference of policy or custom may be drawn from a failure to take remedial action after a constitutional violation.  *See Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir.1991).

197. Defendants had a policy or custom of viewpoint discrimination from the failure of the City or the defendant police supervisors to take any remedial steps after the violation. *See Larez; Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985).

## SECOND CAUSE OF ACTION
### RETALIATION AND RETALIATORY ARREST FOR EXERCISE OF PROTECTED SPEECH
### (42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANT OFFICERS)

198. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

199. At the time of the arrest, Plaintiff Eravi was engaged in constitutionally protected activity.

200. Mr. Eravi was on private property lawfully observing and recording his comments about the events as well as the events themselves.

201. Defendant Officers knew that Plaintiff's conduct did not violate Kansas state law.

202. Defendant Officers knew that Plaintiff's conduct was affirmatively protected by federal law.

203. A reasonable inference from Defendant Officers' conduct and statements both preceding and after the arrest is that Defendant Officers arrested Plaintiff as a direct response to numerous things: Mr. Eravi's prior and current news gathering activities, prior reporting of police activities, his complaints, and his presence and recording of the scene.

204. As a result of observing and video recording the defendant Officers conducting their official duties Plaintiff was arrested, incarnated, and prosecuted.

205. As a result of observing and video recording the defendant Officers conducting their official duties the plaintiff was charged:

> "That on or about May 20, 2023, in Douglas County, Kansas, PHILLIP MICHAEL ERAVI did unlawfully, feloniously, and knowingly obstruct, resist, or oppose a person authorized by law to serve process, to-wit: David McShane and/or other Lawrence Police Officers, in the discharge of any official duty, in the case of a felony, a severity level 9 nonperson felony, in violation of K.S.A. 21-5904(a)(3) & (b)(5)(A)."

206. The charge does not identify any specific officer purportedly interfered with, or the specific official duty the officer was allegedly conducting. The charge does not specify any conduct of Mr. Eravi.

207. The defendant Officers' decision(s) to arrest and initiate prosecution against the plaintiff came directly in response to and because of Plaintiff's reasonable exercise of his constitutionally protected rights under the First Amendment.

208. Defendant Officers sought to punish Plaintiff for his many prior actions, including observing and reporting on the scene, as well as video recording. As a result, the plaintiff suffered monetary damages in attorney fees defending against the prosecution, emotional, other economic, and dignitary injuries.

209. Plaintiff has lost confidence in his ability to assert the rights guaranteed to him the Constitution of the United States of America. Plaintiff fears that officers will continue to retaliate/punish him for asserting his rights in the future.

210. Such actions by Defendant Officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to record police officers engaged in official duties while in public. These deprivations proximately

caused Plaintiff's loss of liberty, emotional distress, and other harms associated with retaliatory arrest.

### THIRD CAUSE OF ACTION
### 42 U.S.C. §1983 FOURTH AMENDMENT VIOLATION – UNLAWFUL ARREST/FAILURE-TO-INTERVENE
### (AGAINST ALL DEFENDANT OFFICERS)

211. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

212. The defendants, as well as other reporting officers, claimed Mr. Eravi's post-arrest conduct justified the arrest. But Mr. Eravi's post-arrest conduct cannot supply the probable cause necessary to initiate the arrest. *See Davis v. City of Apopka*, 78 F.4th 1326, 1333 n.3 (11th Cir. 2023) ("Probable cause is measured at the time of the arrest, not at some time before or after").

213. The cited arresting officers' post-arrest statements are *post hoc* decision-making which together indicate pretext.

214. Mr. Eravi was present on a public area, if not entirely private property.

215. Defendants knew that the plaintiff's specific conduct did not violate any Kansas or Federal law in lawfully observing or recording their activities.

216. Based on their training regarding First Amendment protections, including the right to record, the defendants each knew that the plaintiff's act of observing and recording the scene and the officers was Constitutionally protected activity.

217. Despite knowing this, the defendants arrested Mr. Eravi in retaliation, claiming pretextually that he was arrested for his own safety.

218. Prior to the arrest, there was no crime committed by Mr. Eravi, no emergency, nor did Mr. Eravi threaten, or pose a threat, to any officer.  It was the defendants who drew attention to Mr. Eravi by shining a light upon him, then creating the scene rather than watching Mr. Eravi from a distance in the darkness or shadows while he recorded the scene.

219. At any time during the interaction with Plaintiff or the subsequent booking process, Defendants Twite, Foster, and Shipley had the opportunity to intervene in Defendant McShane's unlawful arrest of the plaintiff but failed to do so.

220. At any time during the interaction with Plaintiff or the subsequent booking process, Defendant McShane had the opportunity to intervene in use of force and booking of the plaintiff but failed to do so.

221. Instead of intervening to prevent the unlawful arrest of Plaintiff, all the defendant Officers either chose to arrest the plaintiff or participate in that arrest without possessing any information that Mr. Eravi committed a crime.

222. The actions as described herein of Defendant Officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from unreasonable search and seizure.

## FOURTH CAUSE OF ACTION
### EXCESSIVE FORCE
### (42 U.S.C. § 1983)
### (AGAINST ALL DEFENDANT OFFICERS)

223. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

224. Plaintiff makes alternative excessive force claims. Plaintiff posed no risk of harm to the defendant Officers.

225. Defendant McShane lacked probable cause to approach, stop, or to arrest Mr. Eravi. Any force used by defendants was excessive because the stop and arrest were unlawful and there was no basis for any threat or any use of force. *Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022).

226. If a jury finds the arrest unconstitutional, the use of force and the search were unconstitutional. This becomes elements of damages for the § 1983 violation.

227. The unwarranted and unwanted physical interaction was not in furtherance of an arrest but was in furtherance of an inquiry.

228. Alternatively, even if the arrest of Mr. Eravi was supported by probable cause, the force used in effectuating the arrest remains excessive.

229. The force was not reasonably proportionate to the need for that force given the totality of the circumstances facing the defendant Officers prior to that force. There was no physical aggression or resistance shown by Mr. Eravi prior to the use of force. In fact, Mr. Eravi was never attempting to make or continue any contact with any of the defendants but was attempting to stay clear of them and make distance between

himself and them when defendant McShane approached and persisted in his close-proximity tactics.

230. As such, the use of force by the defendants McShane, Foster, and Twite was unjustified, and demonstrated deliberate indifference to his constitutional civil rights.

231. Further, after the unwarranted aggressive grabbing of Mr. Eravi's arms, pain pressure maneuvers, and twisting of fingers, they restrained Mr. Eravi to the ground and restricted his movement.

232. Prior to the excessive use of force, the plaintiff Eravi posed no risk of harm to Defendants McShane, Foster, or Twite.

233. Defendant McShane was at no risk of bodily harm from the unarmed Plaintiff.

234. As such, the use of force upon the plaintiff Eravi was unjustified, constituted an unreasonable and excessive use of force, and demonstrated deliberate indifference to his constitutional civil rights.

235. There was gratuitous use of force by defendants Twite and Foster because Mr. Eravi was compliant when he was told he was under arrest and did not resist the arrest.

236. In addition, without cause or justification all of the defendants, including Defendants Sergeant Meagan Shipley, Lieutenant Mark Unruh, and Major Hayden Fowler, contributed to, coordinated with, or otherwise supported the defendants McShane, Twite, and Foster using excessive force upon the plaintiff Michael Eravi.

237. By supporting, contributing, or otherwise enabling Defendant McShane's actions, the defendant Foster allowed an excessive, unnecessary, and disproportionate use of force to be inflicted upon Plaintiff Eravi.

238. Defendant Foster was therefore malicious, reckless, callous and acted with deliberate indifference to Plaintiff Eravi's rights.

239. All of the defendants failed to issue a warning, was not at risk of harm, and was not in the process of effectuating an arrest as Mr. Eravi was walking back South on the apartment property.

240. Likewise, without cause or justification, the defendant McShane contributed to, coordinated with, or otherwise supported the defendants Twite and Foster use of excessive force upon Plaintiff Eravi.

241. By supporting, contributing, or otherwise enabling Defendant's  actions, Major Hayden Fowler was present and participated in the arrest, shined a light upon Mr. Eravi, encouraged and allowed an excessive, unnecessary, and disproportionate use of force to be inflicted upon the plaintiff Eravi.

242. Major Fowler, along with each of the defendant officers Shipley, McShane, Foster, and Twite were each malicious, reckless, callous and acted with deliberate indifference to Plaintiff's rights.

243. The battery, detention, and arrest of this plaintiff was the result of conduct that was reckless, malicious, and deliberately indifferent to Mr. Eravi, and in depriving him of his constitutional rights.

244. All of the named officers in this Complaint, including the defendant Officers, while acting under color of law as authorized officers and agents of the City of Lawrence and the Lawrence Police Department, and while approaching and confronting Mr. Eravi in purported furtherance of their official duty, caused a constitutional deprivation of the rights of this plaintiff under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

245. The actions alleged in this Complaint directly and proximately resulted in injury to the plaintiff.

246. As a direct result of the grossly negligent misconduct of each defendant as set out in this Complaint and associated deliberate indifference, this plaintiff was injured and is entitled to recover damages flowing from the deprivations of the plaintiff's constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

247. Plaintiff is entitled to attorney's fees expended in this litigation pursuant to 42 U.S.C. Section 1988.

WHEREFORE, Plaintiff demands judgment and compensatory and punitive damages against each Defendant, and in addition demands attorney's fees and costs pursuant to 42 U.S.C. Sections 1983 and 1988 and demands trial by jury on all issues so triable.

## FIFTH CAUSE OF ACTION
### MALICIOUS PROSECUTION UNDER 42 U.S.C. SECTION 1983 AGAINST DEFENDANT OFFICERS

248. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

249. Plaintiff was charged with a felony as previously described.

250. After arresting the plaintiff Eravi, each of the defendant Officers caused a judicial proceeding to be commenced against Mr. Eravi by the filing of reports and information in Douglas County Kansas.

251. No reasonably cautious police officer in the position of the Defendant Officers would have believed that Mr. Eravi could be arrested for his own safety or that Mr. Eravi was guilty-in-fact of the crime of felony interference.

252. Said judicial proceeding was instituted by Defendants without probable cause as Mr. Eravi did not commit a crime in the officers' presence or otherwise.

253. A reasonable inference from the lack of probable cause, combined with the defendant Shipley's conduct and testimony given in Mr. Eravi's criminal defense case (that she would have still ordered Mr. Eravi arrested despite Lieutenant Unruh instructing that Mr. Eravi be merely detained), as well as statements made immediately preceding the arrest, during the arrest, and after the arrest, that each of the Officer defendants acted with malice when Mr. Eravi was unlawfully arrested, and initiated the criminal prosecution by booking Mr. Eravi on Saturday, May 20, 2023 at 2:20 a.m., Booking No. 23-01353, offense No. 166983, Statute 16705

(Interference with LEO; unknown circumstance), felony, with a bond amount of $750.00 which was paid by Mr. Eravi.

254. As a result of each of the defendant's respective conduct described in this Complaint, the plaintiff had to endure jail, along with the stress and humiliation of dealing with an unfounded criminal prosecution, multiple unfavorable press coverage, and the incurring of criminal defense attorney fees of Angela Keck, investigator Chalcea Helm, and expert fees of Brent E. Turvey, PhD, a Forensic Criminologist who has made an expert report pertaining to Mr. Eravi's criminal prosecution.

255. The actions as described herein of these defendant officers, while acting under color of state law, deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, including the right to freedom from wrongful prosecution as guaranteed by the Fourth Amendment to the Constitution of the United States of America, made actionable pursuant to 42 U.S.C. § 1983. These deprivations proximately caused Plaintiff's loss of liberty, emotional distress, and other injuries associated with malicious prosecution.

## SIXTH CAUSE OF ACTION
### NEGLIGENT FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. SECTION 1983 AGAINST DEFENDANT CITY OF LAWRENCE

256. The plaintiff hereby realleges and incorporates by reference the allegations contained above.

257. All conditions precedent to filing this action have been met by the plaintiff or have been waived by the City of Lawrence and the City of Lawrence Police Department.

258. On May 19 & 20, 2023, the defendant Officers were acting within the course and scope of their employment as City of Lawerence police officers.

259. The responsibilities related to De-Escalation with respect to The Lawrence PD are clearly written and effectively defined in the Lawrence PD Policy Manual.

260. This incident involved the defendants escalating to the third level of force (Empty-Hand Control/ Pain Compliance /Detention and Arrest) without issuing clear verbal commands to Mr. Eravi. There were no attempts to "safely engage in active communication and listening techniques" in order to de-escalate this contact were made.

261. The videos of this incident demonstrate there are no officers across the street on the sidewalk in front of the Apartment complex, which is directly across the street from 1951 Heatherwood Drive. Consequently, Mr. Eravi can be observed walking up that sidewalk unobstructed and unapproached by law enforcement. He can also be observed to be wearing a bright reflective yellow jacket and conspicuously recording activity with his cellphone.

262. The videos of this incident also reveal that defendant McShane lit the plaintiff up like a target, and drew attention to him. This occurred directly across the street from the active shooter who would likely be looking and aiming their firearm in that

direction — in the line of potential fire. It also occurred directly in front of the apartment complex which had not been evacuated.

263. Defendant McShane does not explain to Mr. Eravi exactly what he expected, either leaving or at least be moving. He also agrees that Mr. Eravi is a "free human being." This context clearly implies that the plaintiff Eravi is not committing a crime, is not under arrest, and is not being detained.

264. When defendant McShane radios in "I can't get him to move" McShane approaches the plaintiff Eravi as he was walking back South and immediate grabs him by the arms to forcibly hold him. This results in a struggle. Officer McShane does this without issuing any coherent commands, instructions, or rationale — immediately after indicating that Mr. Eravi was not committing any violations.

265. Multiple Officers swarm the location to help forcibly hold and handcuff the Defendant. During this process, Officer Twite turns off his body worn camera (BWC) audio inexplicably, rapidly approaches to insert himself into the arrest, and uses pain compliance against Mr. Eravi. Defendant Twite can also be observed pulling the Defendant's fingers back to induce extreme pain.

266. During this sudden law enforcement swarm of the Defendant, an Officer can be heard screaming expletives at Mr. Eravi in a verbally threatening manner.

267. The communications between Officer McShane, Sgt. Megan Shipley, and Lt. Mark Unruh indicate strong contradictions with respect to how to handle the plaintiff's presence at the scene. Officer McShane has indicated to the plaintiff Eravi that he is free and not being detained; Lt. Unruh has instructed that Mr. Eravi should

simply be detained; and Sgt. Shipley instructs Officer McShane to arrest the plaintiff despite her superior's statement. At no time is Mr.  Eravi given clear orders to respond to, advised of the situation, or instructed that he has committed a crime and is being placed under arrest.

268. Rather, the physical restraint and sudden officer swarm comes without any attempt to communicate clear lawful orders or information to this plaintiff. This was all done in the context of "officer rage" according to the expert report of Dr. Turvey.

269. During this incident, multiple individuals were walking in the same area as the plaintiff and the parking areas of the Apartment complex, without confrontation or incident. Law enforcement officers can even be observed engaging in cordial / professional conversations with at least one of these individuals. This indicates that citizen journalist Phillip Michael Eravi was targeted for approach at the scene because of who he was and what he was doing (observing and video recording the activities of law enforcement and not showing them sufficient deference).

270. Given that radio traffic named Mr. Eravi as the approaching individual from a distance, these Lawerence City Officers were not so much distracted as they were willing spectators watching their officers "take care of business" regarding this unwelcome videographer and critic of police activities.

271. The hyper-escalation of use of force in this case occurred without clear communication between Officers and Mr. Eravi; and without clear and consistent communication or messaging within the command structure at the scene. It also occurred without consideration of de-escalation.

272. The actions against the plaintiff Eravi was selective – targeted solely towards Mr. Eravi when others doing the same things were not. The hyper-escalation of force, sudden swarming, and screaming of expletives was a result of the personal animosity towards Phillip Michael Eravi, by these Lawrence Police Department members in general; and at least the defendant Officer Twite in specific.

273. With respect to the Lawrence Police Department Policy Manual, the following negligent failures by members of the Lawrence Police Department are evident:

- Negligent failure to secure the scene and establish a viable security perimeter.
- Negligent failure to protect including Eravi and other citizens from entering and exiting the area.
- Negligent failure to effectively communicate with other agencies.
- Negligent failure to communicate internally at the scene.
- Negligent failure to protect Mr. Eravi once he was forcibly detained.

274. Responsibilities related to establishing and securing the scene perimeter with respect to the Lawrence Police Department Critical Response Team (CRT) are clearly written and effectively defined in the Lawrence PD Policy Manual (pp.202-203). They include: "(c) Evacuate or provide safety instructions to other people in the zone of danger. (d) Establish an inner and outer perimeter. (e) Establish a command post outside of the inner perimeter."

275. No inner and outer perimeters were physically established and properly manned despite the pretextual law enforcement reports, sworn affidavits, and testimony by the defendants to the contrary.  If there were any inner and outer perimeters they were not clearly communicated or established by law enforcement at the scene of this shooting.

276. None of the residents and civilians in the area were evacuated or properly notified of the danger in the neighborhood. Rather some were apparently told or suggested to leave or shelter in place (yet still directly in the line of fire of the shooter across the street or next door).

277. These individuals that the defendants claimed were in a zone of danger were not evacuated; not provided clear or consistent safety instructions; and not instructed on the hazards of entering or leaving the neighborhood.

278. As far as Command Scene Responsibilities, the Lawrence PD CRT policies are clearly written and effectively defined in the Lawrence PD Policy Manual (pp.202-203). They also include: 404.7.4 ON-SCENE COMMAND RESPONSIBILITIES.

279. Upon arrival of the CRT at the scene, the "Incident Commander shall brief the CRT Commander and team supervisors. Once the CRT Commander authorizes deployment, the CRT Commander or the authorized designee will be responsible for the tactical response and negotiations. The Incident Commander shall continue to supervise the command post operation, outer perimeter security, evacuation and media access and will support the CRT. The Incident Commander and CRT Commander or the authorized designee shall maintain direct communication at all times."

280. While the CRT Commander, Sgt. Shipley, and Lt. Unruh were in communication, these communications were apparently garbled, ineffective, and ignored with respect to how to respond to Mr. Eravi's presence. Specifically, Sgt.

Shipley testified under oath in Mr. Eravi's criminal proceeding that even if she had clearly understood the orders from her superiors, she would have ignored them.

281. The CRT Commander, Sgt. Shipley, was distressed over the possibility of insufficient personnel responding to the scene. However, Maj. Fowler can be heard on Lt. Unruh's BWC stating: "We have plausible deniability in place. Instead of calling in people that need not be here, I sent them a text that hopefully will not wake them, so I can say I notified."

282. In other words, Major Fowler knows the Police Department did not take the required steps to call in extra personnel, or properly notify other team members within their agency, to ensure an informed response to the unfolding crisis. Rather, they were concerned more with creating "plausible deniability" for their decisions that evening at the highest level of command.

283. The City and its Police Department failed to properly train and supervise police officers in how to handle Mr. Eravi's presence at the scene observing and recording, as well as the securing of a crime scene and the use of force.

284. The named officers in this Complaint breached the duties owed to this plaintiff when they each failed to adhere to accepted law enforcement standards and practices for detaining and arresting subjects.

285. The City failed to properly train and supervise its officers as to its Policy on recording police activity.

286. The City failed to properly train and supervise its officers as to its Policy on alternative non-violent tactics to decrease the intensity of a situation, improve

decision-making, improve communication, reduce the need for force, and increase voluntary compliance.

287. The City has ratified and approved the actions of each of the defendants as the City Police Department and these defendants continue defending and justifying all of that conduct in Mr. Eravi's criminal proceedings.

288. Defendant City of Lawrence and its Police Department owed Plaintiff, as well as all citizenry, a duty of care to hire and retain and supervise competent, law-abiding officers, as well as to enact policies that ensure that officers do not arrest citizens because of bias or without probable cause or use excessive force against civilians.

289. Defendant City of Lawrence breached its duty of care to Plaintiff by hiring and retaining, and improperly supervising each of the named City Officers in this Complaint.

WHEREFORE as a proximate and direct result of the negligence of the City of Lawrence, Plaintiff suffered severe mental and emotional distress arising from fear of incarceration and the humiliation, shame, embarrassment, and disgrace from detention, interrogation, arrest, booking, fingerprinting, and search of his body, bodily injury resulting in physical pain and suffering and diminished health, mental pain and suffering, loss of the capacity for the enjoyment of life, loss of earnings, and diminution and loss of the ability to earn money which are either permanent or continuing to this day and are likely to continue into the future.

## PRAYERS FOR RELIEF

290. As to all counts, Defendants, under color of law, have deprived and continue to deprive the plaintiff of the right to petition, associated, and free speech in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution. Accordingly, this plaintiff is damaged in violation of 42 U.S.C. § 1983, and, therefore, is entitled to damages; declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of the defendants' unconstitutional customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

291. That as a direct and proximate result of the aforementioned unlawful conduct and omissions of each of the defendants, Plaintiff suffered fear, pain, anguish, and the following damages: a. shock, fright, anxiety, mental distress, annoyance, vexation, and humiliation suffered by plaintiff; b. loss of freedom; c. pain and suffering during the arrest and confinement; d. isolation from friends and family; e. loss of dignity; f. loss of reputation; g. Loss of enjoyment of life; h. Compensatory and punitive damages; and any and all other damages otherwise recoverable under USC Section 1983 and Section 1988; and punitive damages in the individual capacity of each Defendant.

292. Mr. Eravi' First Amendment rights were callously violated by each defendant sued in their individual capacity.

293. Mr. Eravi' First Amendment rights were maliciously violated by each defendant sued in their individual capacity.

294. Mr. Eravi' First Amendment rights were wantonly violated by each defendant sued in their individual capacity.

295. Mr. Eravi' First Amendment rights were oppressively violated by each defendant sued in their individual capacity.

296. The acts by the defendants in this Complaint were prompted or accompanied by ill will, or spite, or grudge, either toward Mr. Eravi individually, or toward persons in one of more groups or categories of which Mr. Eravi is a member.

297. The acts by the defendants in this Complaint were done in reckless or callous disregard, or indifference to, the rights of one of more persons, including Mr. Eravi.

298. The acts by the defendants in this Complaint were done in a way or manner which injures, or damages, or otherwise violates the rights of Mr. Eravi with unnecessary harshness or severity, as by misuse or abuse of authority or power, or by taking advantage of some weakness, or disability, or misfortune of Mr. Eravi.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against all Defendants for compensatory damages, as referenced above, punitive damages against the individual Defendants, for interest as allowed by law, for costs, expert witness fees, and reasonable attorney fees, as allowed by statute or as otherwise allowed by law, and for any other and further relief that this Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

## Verification of Complaint

I, Michael Eravi, am the plaintiff in the above-captioned matter.  I have reviewed the foregoing allegations in this Verified Complaint, and I hereby declare under penalty of perjury that the foregoing allegations are true and correct to the best of my knowledge and understanding.

Date: 17 MAy 2024

By: _____
Michael Eravi