## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**PHILLIP MICHAEL ERAVI,**

           **Plaintiff**,

**v.**

        Case No. 24-4042-DDC-RES

**CITY COMMISSION OF LAWRENCE,
KANSAS, et al.,**

           **Defendants**.

## MEMORANDUM AND ORDER

    Plaintiff Phillip Michael Eravi, a citizen journalist in Lawrence, Kansas, asks the court to hold local police officers and the City Commission of Lawrence liable for allegedly violating his constitutional rights.

    In the early morning hours of May 20, 2023, plaintiff arrived on the scene of a police stand-off. An active shooter was holed up in the shooter's residence. Police were trying to coax the suspect out while keeping the surrounding neighborhood safe. Plaintiff contends he wanted to video record the police performing their duties—a right protected by the First Amendment. Police, however, viewed plaintiff as interfering and distracting them from their duties. They allegedly couldn't get him to stop moving near the suspected shooter's residence. And so, the officers arrested him for interference with law enforcement, a felony under Kansas law. Plaintiff asserts the arrest was retaliatory. He also alleges that the officers used excessive force, failed to intervene, and, later, were responsible for a malicious prosecution against him. The officer

defendants, plaintiff contends, violated his constitutional rights under color of state law, contravening 42 U.S.C. § 1983.

Plaintiff also asserts § 1983 claims against the City Commission of Lawrence for prior restraint, a retaliatory policy of prohibiting exercise of protected speech, and negligent failure to train and supervise. He contends that Lawrence Police Department policy about recording law enforcement activity functions as a prior restraint of protected speech. He also alleges that the officer defendants used the city's policy to single him out in retaliation for his status and viewpoints—making it a retaliatory policy. Finally, he alleges the city negligently failed to train and supervise based on failure to secure the scene, de-escalate the situation, communicate clearly, handle plaintiff's presence properly, and protect plaintiff once he was arrested.

The officer defendants move to dismiss, asserting a qualified immunity defense. Doc. 31. The court concludes, even when taking plaintiff's well-pleaded allegations as true, that plaintiff fails to shoulder his burden once qualified immunity is invoked. Namely, he fails to show that any constitutional violation occurred. The court thus dismisses all claims against the officer defendants as barred by qualified immunity. The City Commission of Lawrence also moves to dismiss for failure to state a claim. Doc. 7. The court concludes that plaintiff's § 1983 claim fails because the city's recording policy isn't a prior restraint; it imposes reasonable restrictions; it isn't retaliatory; and plaintiff didn't allege sufficient facts to support his failure-to-train liability theory. So, the court dismisses the claims against the city, as well.

## I.    Background

The following facts come from plaintiff's Complaint (Doc. 1). The court accepts plaintiff's "'well-pleaded facts as true, view[s] them in the light most favorable to the Plaintiff, and draw[s] all reasonable inferences from the facts in'" plaintiff's favor. *Audubon of Kan., Inc.*

*v. U.S. Dep't of Interior*, 67 F.4th 1093, 1108 (10th Cir. 2023) (brackets omitted) (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

### The Parties

Plaintiff Phillip Michael Eravi is a "citizen journalist" who operates a YouTube channel called "Lawrence Accountability." Doc. 1 at 1, 9 (Compl. ¶¶ 1, 38). His channel is a "local and independent media source focused on accountability and governmental oversight." *Id.* at 15 (Compl. ¶ 69). Plaintiff is well-known in Lawrence, Kansas for his civil activism and reporting on police activities. *Id.* at 1 (Compl. ¶ 1). He has reported on numerous crime scenes and Lawrence police officers recognize him. *Id.* at 20 (Compl. ¶¶ 91, 92).

Defendants include the City Commission of Lawrence, Kansas—the governing body of the Lawrence City Police Department—and four officer defendants. *Id.* at 1 (Compl.). The officer defendants are Lawrence police officers: Austin Twite, Grant Foster, Meagan Shipley, and David McShane. *Id.* at 11 (Compl. ¶¶ 44–47). During the law enforcement incident described below, McShane, Twite, and Foster physically restrained and arrested plaintiff. *Id.* at 39 (Compl. ¶¶ 149, 152). Shipley was the designated leader of the team responding to the incident. *Id.* at 21 (Compl. ¶ 96). Before the night in question, plaintiff had a run-in with Twite, in which Twite purportedly pushed plaintiff backwards while he was handcuffed. *Id.* at 46 (Compl. ¶ 175). Plaintiff filed a complaint with Twite's supervisors as a result. *Id.* at 16 (Compl. ¶ 73).

### The Shooting Incident and Subsequent Police Activity

Around 10:37 PM on May 19, 2023, Lawrence police officers, including the four officer defendants, responded to a reported shooting between neighbors in the 1900 block of Heatherwood Drive in Lawrence, Kansas. *Id.* at 12, 17 (Compl. ¶¶ 54, 79). The officers

believed that an armed shooter was inside one of the homes.  *Id.* at 12–13 (Compl. ¶ 56).  The

Lawrence Police Department Critical Response Team parked an armored vehicle in the shooting

suspect's driveway and attempted, to no avail, to coax the shooter out of the residence using a

loudspeaker.  *Id.* at 12–13 (Compl. ¶ 56).  The garage door and interior house door both were

open, making vigilant, continuous coverage of the opened garage critical.  *Id.* at 13 (Compl.

¶ 59).  Shipley was the designated leader of the "contact team" stationed in the shooting

suspect's driveway.  *Id.* at 21 (Compl. ¶ 96).  Officers advised neighboring residents to evacuate

or shelter in place because of danger to the public.  *Id.* at 13–14 (Compl. ¶ 61).  Shipley reported

that the team "deployed to the outside of the armored vehicle" around 1:10 AM.  *Id.* at 21

(Compl. ¶ 96).  This "stand off" lasted approximately five hours.  *Id.* at 13, 17 (Compl. ¶¶ 57,

81).  At 4:00 AM on May 20, 2023, law enforcement officers entered the residence and

apprehended the shooting suspect, who was armed at arrest.  *Id.* at 13 (Compl. ¶ 57).

### *Plaintiff's Reporting Activity and Police Contact*

At around 1:50 AM on May 20, 2023, officers on the scene observed plaintiff

approaching the area on foot.  *Id.* at 21, 22 (Compl. ¶¶ 95, 100).  Plaintiff was video recording

his surroundings on his cell phone.  *Id.* at 47, 61 (Compl. ¶¶ 179, 261).  Approaching from the

south, plaintiff saw a police vehicle blocking vehicle entry into the area, but sidewalks were not

blocked off from pedestrian traffic.  *Id.* at 17, 19 (Compl. ¶¶ 83, 88).  Officers hadn't marked a

visible perimeter with security tape and weren't patrolling the perimeter.  *Id.* at 14, 18 (Compl.

¶¶ 64, 85).  Plaintiff walked north on Heatherwood Drive towards the shooting suspect's

residence and armored vehicle but remained on the east side of the street—opposite from the

residence and armored vehicle.  *Id.* at 22–23 (Compl. ¶ 101).

As plaintiff walked north along a sidewalk, he saw McShane and Foster ahead, also on the east side of Heatherwood Drive. *Id.* at 24, 29 (Compl. ¶¶ 103, 113). McShane "spotlighted," or shined his flashlight at plaintiff. *Id.* at 22, 24 (Compl. ¶¶ 101, 104). McShane apprehended plaintiff as they approached each other, physically meeting nearly across the street from the shooting suspect's residence and the armored vehicle. *Id.* at 23, 26 (Compl. ¶¶ 101, 107). The Complaint includes quoted dialogue between plaintiff and McShane, apparently taken from body cam footage. *See id.* at 26, 29 (Compl. ¶¶ 107, 111). After an initial interaction where McShane told plaintiff "You can't be right here," the dialogue continued as follows:

| | | |
|---|---|---|
| Eravi | (1:04): | Don't touch me. |
| McShane | (1:05): | If you want to walk, walk. But I have to cover you. Let's go. |
| Eravi | (1:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (1:16): | You live here? |
| Eravi | (1:16): | You need to leave me alone. |
| McShane | (1:19): | Come on. Just get inside if you live here. |
| Eravi | (1:20): | You need to leave me alone. |
| McShane | (1:21): | Sir, I need you to leave. |
| Eravi | (1:23): | You need to leave me alone. |
| McShane | (1:24): | I will. Just keep walking. |
| Eravi | (1:27): | I'm a free human being. You need to leave me alone. |
| McShane | (1:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (1:30): | Leave me alone. |
| McShane | (1:30): | I'll walk with you. |
| Eravi | (1:31): | Leave me alone. |
| McShane | (1:34): | I can't get him to move. |
| Eravi | (1:37): | You motherfuckers woke me up. Leave me alone. You woke me up. |
| McShane | (1:39): | What's your name? |
| Eravi | (1:40): | You woke me up. You got me out here. Leave me alone. |
| McShane | (1:42): | Okay. Come on. |
| Eravi | (1:43): | Get off me, dude. |

*Id.*

McShane allegedly followed plaintiff around "vaguely herding" plaintiff "to an unknown destination." *Id.* at 16–17 (Compl. ¶ 77). Plaintiff attempted to distance himself from McShane

by walking east towards some adjacent apartments, then turning north, then walking back south. *Id.* at 28 (Compl. ¶ 111). McShane's supervisor, Shipley, was across the street, standing behind the armored vehicle. *Id.* at 22 (Compl. ¶ 100). As plaintiff was walking south, McShane reported to Shipley that he "can't get him to move." *Id.* at 37 (Compl. ¶ 145). Shipley's superior, Lieutenant Unruh, captured this dialogue on his body cam:

| | |
|---|---|
| Unruh: | Yeah, we got units going down there to make contact. |
| Shipley: | Okay, he's continuing to come closer. |
| Unruh: | Yep, we got guys right there walking towards him. I don't know if that's our subject or not. |
| Shipley: | He can't be right behind the armor. |
| McShane: | I can't get him to move. |
| Shipley: | Just arrest him. |
| Unruh: | Go ahead and detain him. |

*Id.* at 32 (Compl. ¶ 119).

### The Arrest

After Shipley's instruction, McShane, Foster, and Twite physically restrained plaintiff. *Id.* at 39 (Compl. ¶ 149). They "each"[1] used painful techniques including "body and neck restraints, bending of the wrists and twisting of" plaintiff's fingers. *Id.* These physical restraint methods caused injury and pain to plaintiff. *Id.* None of the arresting officers told plaintiff he was under arrest until about thirty seconds after they began physically restraining him. *Id.* at 39, 45 (Compl. ¶¶ 151, 172). Plaintiff alleges that, before the arrest, no officer told him that he was in danger, in the line of fire, or in a crime scene perimeter. *Id.* at 33 (Compl. ¶ 124). At the time of the arrest, the following dialogue occurred between plaintiff and three officers:

| | | |
|---|---|---|
| Zarnowiec | (2:09): | You're under arrest right now. |
| Eravi | (2:19): | Name. |
| Zarnowiec | (2:19): | Okay? |

---

[1] The Complaint does not specify which officer defendant used which restraint technique. *See* Doc. 1 at 16 (Compl. ¶ 74) ("Mr. Eravi was forcefully moved around by the defendant officers using pain compliance tactics."); *id.* at 39 (Compl. ¶ 149) ("Mr. Eravi repeatedly visibly and orally expressed pain where the defendants were each intentionally using techniques that were purposeful to cause Mr. Eravi pain including body and neck restraints, bending of the wrists and twisting of Mr. Eravi's fingers.").

| McShane | (2:19): | It's Officer McShane. |
| Eravi | (2:20): | Name. |
| Zarnowiec | (2:20): | Put your hands behind your back.  Okay? |
| Eravi | (2:21): | Why am I under arrest? |
| Foster | (2:22): | For interfering, Mike. |
| Eravi | (2:26): | Dude, you guys fucking woke me up in the middle of the fucking night. |
| Zarnowiec | (2:29): | I just . . . pulled up to this, man. |
| Eravi | (2:30): | With all your fucking sirens and shit, dude. |
| Zarnowiec | (2:32): | All I know is they said that you're under arrest for interfering. |

*Id.* at 41 (Compl. ¶ 153).

After plaintiff was arrested, non-defendant Officer Fowler informed plaintiff that there was "a complex situation going on[,]" that plaintiff was "directly in the line of fire[,]" and that the officers had tried to get plaintiff to leave the area, but he refused.  *Id.* at 42 (Compl. ¶ 154) (quoted dialogue between plaintiff and Fowler).  Defendants later asserted another reason for the arrest was that "they were attempting 'service of process.'"  *Id.* at 29 (Compl. ¶ 112).  Plaintiff alleges that no "purported 'service of process' to anyone was occurring at the time Mr. Eravi was confronted and later arrested."  *Id.* at 42 (Compl. ¶ 157).  Plaintiff alleges that other individuals were outside in the area at the time, but officers didn't confront or arrest them.  *Id.* at 42 (Compl. ¶ 156).

### *Misleading, False Reports*

The Complaint outlines alleged inconsistencies or omissions between the events and the police reports written by Twite, Foster, Shipley, and McShane.  *See id.* at 29 (Compl. ¶ 113) (Twite); *id.* at 30 (Compl. ¶ 115) (Foster); *id.* at 33 (Compl. ¶ 123) (Shipley); *id.* at 33 (Compl. ¶ 122) (McShane).  It also outlines alleged falsehoods or inconsistencies in Shipley's affidavit later used to charge plaintiff.  *Id.* at 43–46 (Compl. ¶¶ 160–74).  Alleged falsehoods include, for example, that officers had acquired a search warrant to enter the shooting suspect's home "during the alleged incident."  *Id.* at 43 (Compl. ¶ 161).  But officers didn't serve the warrant

7

until "well after" plaintiff's arrest.  *Id.* (Compl ¶ 162).  Plaintiff was charged with a felony under

Kan. Stat. Ann. §§ 21-5904(a)(3) & (b)(5)(A) for "unlawfully, feloniously, and knowingly

obstruct[ing], resist[ing], or oppos[ing] a person authorized by law to serve process[.]"  *Id.* at 52

(Compl. ¶ 205).

## II.    Legal Standard

Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss an action for failing "to state a

claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a

Rule 12(b)(6) motion, the pleading "must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a

sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

"If, in the end, a plaintiff's 'well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct,' the complaint fails to state a claim."  *Warnick v. Cooley*, 895

F.3d 746, 751 (10th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 679).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the

factual allegations in the complaint are true, but it is "'not bound to accept as true a legal

conclusion couched as a factual allegation[.]'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

U.S. at 555).  And, while this pleading standard doesn't require "'detailed factual allegations,'" it

demands more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of

the elements of a cause of action'" which, the Supreme Court has explained, "'will not do.'"  *Id.*

(quoting *Twombly*, 550 U.S. at 555).

III.        **Officer Defendants' Motion to Dismiss (Doc. 31)**

Plaintiff brings four claims against the four police officer defendants, all for allegedly violating 42 U.S.C. § 1983.  Plaintiff alleges retaliatory arrest (Count II), failure to intervene (Count III), excessive force (Count IV), and malicious prosecution (Count V).  Each officer defendant asserts the defense of qualified immunity.  The court begins with an overview of the law governing § 1983 claims and qualified immunity, before applying that law to each of plaintiff's four claims individually.

A.        **Section 1983**

A plaintiff may bring a civil cause of action under 42 U.S.C. § 1983, "which requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler v. Stitt*, 104 F.4th 770, 797 (10th Cir. 2024) (internal quotation marks and citation omitted).  A plaintiff may assert a § 1983 claim against either a municipality or an individual.  *See Brown v. City of Tulsa*, 124 F.4th 1251, 1264 (10th Cir. 2025) (permitting § 1983 suit for policies and practices of municipal police department), *id.* at 1266 (permitting § 1983 suit against police chief in his individual capacity).  As a defense against a § 1983 claim, an individual defendant may assert qualified immunity.  *Id.* at 1266.  The court outlines the broad contours of the qualified immunity defense, next.

B.        **Qualified Immunity**

"A motion to dismiss based on qualified immunity imposes the burden on the plaintiff to show 'both that [1] a constitutional violation occurred and [2] that the constitutional right was clearly established at the time of the alleged violation.'"  *Doe v. Woodard*, 912 F.3d 1278, 1289 (10th Cir. 2019) (quoting *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009)).  The "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Regardless of the "conduct at issue,

Defendant is nonetheless entitled to qualified immunity unless Plaintiff has carried her burden of

showing the law was clearly established."  *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir.

2020).  Indeed, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part

burden; otherwise, the defendants are entitled to qualified immunity."  *Felders ex rel. Smedley v.

Malcom*, 755 F.3d 870, 877–78 (10th Cir. 2014) (internal citation and quotation marks omitted).

In such a situation, "'the defendant prevails on the defense'" and the plaintiff's claims "are

dismissed."  *Losee v. Preece*, No. 2:18-CV-195, 2022 WL 957194, at *5 (D. Utah Mar. 30,

2022) (quoting *A.M. v. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016)).

A court has discretion to determine which of these two prongs it should address first "'in

light of the circumstances in the particular case at hand.'"  *Harris v. Mahr*, 838 F. App'x 339,

342 (10th Cir. 2020) (quoting *Pyle v. Woods*, 874 F.3d 1257, 1263 (10th Cir. 2017)).  Here, the

court's analysis begins—and ends—with the first prong, *i.e.*, whether a constitutional violation

occurred.  The court addresses each of the four alleged constitutional violations, in turn, below,

starting with retaliatory arrest.

## C.  Retaliatory Arrest

Plaintiff alleges that the officer defendants arrested him while he was engaged in a

constitutionally protected activity, namely observing and video recording the officer defendants

conducting their official duties.  Doc. 1 at 51 (Compl. ¶¶ 199, 204).  And he alleges his arrest

was retaliatory.  Officers allegedly retaliated against plaintiff for his "prior and current news

gathering activities, prior reporting of police activities, his complaints, and his presence and

recording of the scene."  *Id.* (Compl. ¶ 203).  In short, plaintiff contends that the officers' arrest

"came directly in response to and because of [p]laintiff's reasonable exercise of his

constitutionally protected rights under the First Amendment" including "the right to record police officers engaged in official duties while in public." *Id.* at 52 (Compl. ¶¶ 207, 210). Plaintiff also asserts that he "fears that officers will continue to retaliate/punish him for asserting his rights in the future." *Id.* (Compl. ¶ 209).

To assert a First Amendment retaliation claim, plaintiff must allege:  (1) he "was engaged in constitutionally protected activity"; (2) defendants' "actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) defendants' "adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000) (internal quotation marks and citation omitted).  "In addition to the three *Worrell* elements, a First Amendment retaliation claim based on a false arrest requires a separate 'threshold showing'—generally, a plaintiff must show a false arrest." *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1227 (10th Cir. 2020) (citing *Nieves v. Bartlett*, 587 U.S. 391, 407–08 (2019)).  The "'plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest.'" *Id.* (quoting *Nieves*, 587 U.S. at 402).

"Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (citation and internal quotation marks omitted).  The dispositive question turns on "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Id.* at 896–97 (internal quotation marks and citation omitted).

Here, the officer defendants' motion targets this threshold probable cause requirement. According to the officer defendants, the Complaint reveals that probable cause to arrest plaintiff existed. Doc. 32 at 9. So, plaintiff fails to shoulder his burden at prong one—showing that a constitutional violation occurred—and qualified immunity thus applies to bar this claim. *Id.* at 11. Specifically, the officer defendants contend that the Complaint provides "ample cause for Plaintiff's arrest for interference which has nothing to do with the exercise of his First Amendment rights." *Id.* at 9. They argue plaintiff interfered with law enforcement because he "failed to comply with lawful orders." *Id.* That is, he "continued to walk in and around an active police situation[,]" ignoring McShane's instruction to "get inside if he lived there and otherwise he needed to leave and keep walking." *Id.* at 10.

Plaintiff's Response argues that there "was no 'lawful order' that was disobeyed that merited probable cause for arrest." Doc. 34 at 3. Instead, plaintiff argues, the Complaint demonstrates that McShane permitted plaintiff to walk and promised plaintiff protection, *i.e.*, that McShane would "cover him." *Id.* at 5 (citing Doc. 1 at 33–34 (Compl. ¶¶ 126–30)). So, plaintiff concludes, there "can be no probable cause to arrest based upon compliance with police guidance." *Id.* at 6.

Kan. Stat. Ann. § 21-5904(a)(3) defines interference with law enforcement to include "knowingly obstructing, resisting or opposing any person authorized by law to serve process . . . in the discharge of any official duty." To commit the offense, the person arrested must know that an individual is a law enforcement officer, the officer is carrying out an official duty, and defendant knowingly and willfully obstructs or opposes the officer. *State v. Brown*, 387 P.3d 835, 848 (Kan. 2017). Disobedience of a lawful order qualifies as interference with law enforcement that would support probable cause. *See United States v. Mosley*, 743 F.3d

1317, 1330 (10th Cir. 2014) ("Defendant's failure to comply with this lawful order gave the officers probable cause to arrest him at least for the Kansas criminal offense of 'interference with law enforcement.'").

But disobedience isn't the only way a person can commit interference. A person can obstruct an officer by resisting or passively impeding an officer while the officer carries out an official duty. *Brown*, 387 P.3d at 849 (citations omitted). Any such act "'must have substantially hindered or increased the burden of the officer in carrying out his official duty.'" *Id.* (quoting *State v. Parker*, 690 P.2d 1353, 1362 (Kan. 1984)). Acts that cause officers to worry about safety substantially hinder an officer carrying out his duties. *See id.* (holding that a jury could convict a defendant of interference with law enforcement when he hid in a "basement from officers who identified themselves and ordered him to come out" for five to 10 minutes because the defendant "created an immediate safety issue for both the officers and [the defendant]").

Here, the Complaint alleges facts suggesting plaintiff committed interference in two ways: disobedience and hindering an officer with safety concerns. *First*, take disobedience of a lawful order. In his Response to defendants' motion, plaintiff argues that McShane didn't give any commands. Doc. 34 at 5. Instead, he only granted plaintiff permission to walk and promised to cover plaintiff. *Id.* (citing Doc. 1 at 33–34 (Compl. ¶¶ 126–30)). But plaintiff's Complaint alleges otherwise. McShane made at least two imperative statements to plaintiff while attempting to distance plaintiff from the active shooter area: "Just get inside if you live here" and "Sir, I need you to leave." Doc. 1 at 29 (Compl. ¶ 111). What's more, McShane's alleged permission to walk and promise of cover, in context, are akin to commands as well— intended to accomplish the same purpose as the imperative statements—removal. To wit:

McShane        (1:05): If you want to walk, walk. But I have to cover you. Let's
                       go.

13

| Eravi | (1:09): | You ain't got to cover me, man. I ain't nobody that needs to be covered. |
| McShane | (1:16): | You live here? |
| Eravi | (1:16): | You need to leave me alone. |
| McShane | (1:19): | Come on. Just get inside if you live here. |
| Eravi | (1:20): | You need to leave me alone. |
| McShane | (1:21): | Sir, I need you to leave. |
| Eravi | (1:23): | You need to leave me alone. |
| McShane | (1:24): | I will. Just keep walking. |
| Eravi | (1:27): | I'm a free human being. You need to leave me alone. |
| McShane | (1:27): | I agree. You are. Keep walking, please. Come on. |
| Eravi | (1:30): | Leave me alone. |
| McShane | (1:30): | I'll walk with you. |
| Eravi | (1:31): | Leave me alone. |
| McShane | (1:34): | I can't get him to move. |

*Id.* McShane repeatedly instructs plaintiff to walk or keep walking. In context, however, plaintiff's pleading makes clear that the officer didn't permit plaintiff to wander around the active shooter area or remain in proximity to the suspected shooter's residence. He wanted to clear plaintiff out of that space. His admonitions to "keep walking" sought to accomplish that end.

Officer McShane's inability to get plaintiff to move led to plaintiff's arrest, as demonstrated by the next chunk of dialogue alleged by plaintiff in his Complaint:

| Unruh: | Yeah, we got units going down there to make contact. |
| Shipley: | Okay, he's continuing to come closer. |
| Unruh: | Yep, we got guys right there walking towards him. I don't know if that's our subject or not. |
| Shipley: | He can't be right behind the armor. |
| McShane: | I can't get him to move. |
| Shipley: | Just arrest him. |
| Unruh: | Go ahead and detain him. |

*Id.* at 32 (Compl. ¶ 119). Immediately after McShane identified his inability to clear plaintiff out of the area, superior officers instructed McShane to arrest or detain him. The dialogue establishes that plaintiff's physical presence near the armored vehicle and McShane's inability to get him to clear out of the area led to plaintiff's arrest.

Nowhere does the dialogue alleged in the Complaint reference plaintiff's recording of police activities. And the right to film police while they're performing their duties is subject to time, place, and manner restrictions, anyway. *Irizarry v. Yehia*, 38 F.4th 1282, 1292 n.10 (10th Cir. 2022) (explaining that no time, place, and manner restrictions apply when the recording "'does not interfere with the police officers' performance of their duties'" (quoting *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011)). Here, plaintiff didn't film the officers "from a comfortable remove." *Glik*, 655 F.3d at 84 (quotation cleaned up). He was moving to and fro in the middle of an ongoing crime scene with an active shooter. *See* Doc. 1 at 28 (Compl. ¶ 111) (explaining plaintiff's movements near the shooter's residence, first walking east, then turning north, then turning back south). Plus, dialogue concurrent with plaintiff's arrest identifies interference with law enforcement as the reason for his arrest. *Id.* at 41 (Compl. ¶ 153) (reciting officers' answer to plaintiff's question about reason for arrest as "For interfering, Mike. . . . All I know is they said that you're under arrest for interfering.").

This dialogue establishes McShane gave lawful orders, attempting to remove plaintiff from the area because he was interfering with police officers' efforts to perform their duties. And plaintiff didn't comply. Plaintiff's disobedience provides probable cause to arrest plaintiff for interference.

But even if the court concluded McShane didn't command plaintiff at all, probable cause for interference still inheres. The Complaint alleges at-the-scene concerns by law enforcement about plaintiff's safety. *Id.* at 29 (Compl. ¶ 111) (capturing body cam dialogue of McShane saying to plaintiff, "I have to cover you" and "Just get inside if you live here."); *id.* at 4 (Compl. ¶ 12) (quoting incident report of Officer Pate—not a defendant—who explained that "officers approached [plaintiff] . . . to direct him to leave the area as it was not safe"). And the

Complaint recites allegations about the severity of the active threat, suggesting officers' safety concerns were justified. *See id.* at 13 (Compl. ¶ 58) (explaining active shooter suspect was inside residence, refusing to exit, armed, had fired several rounds at his neighbor, and had access to AR-15 type rifle); *id.* (Compl. ¶ 59) (noting suspect's residence had garage door and interior door open, requiring constant coverage); *id.* at 13–14 (Compl. ¶ 61) (identifying neighborhood advisory to either evacuate or shelter in place). The Complaint alleges plaintiff's continued movement in proximity to the active shooter's residence. *See id.* at 28 (Compl. ¶ 111) (explaining that plaintiff walked east, then turned north, then walked back south). And officers' incident reports identified plaintiff as a person distracting them from their duties. *See id.* at 4 (Compl. ¶ 12) (quoting Officer Pate's incident report as noting that his "attention was divided"); *id.* (Compl. ¶ 13) (quoting McShane's incident report as claiming that "it was clear that several tactical officers were distracted and interfered with by [plaintiff's] actions"). Probable cause for interference thus existed based on plaintiff hindering officers from carrying out their duties because of their concerns for his safety. *See Brown*, 387 P.3d at 849. A "reasonable officer would have believed that probable cause existed to arrest" plaintiff for interference with law enforcement "based on the information possessed by the arresting officer." *Valenzuela*, 365 F.3d at 896–97 (internal quotation marks and citation omitted).

Plaintiff alleges that the reasons for his arrest were "pretextual" and "it was really because this plaintiff had been a long standing public irritant to this police force." Doc. 1 at 2, 5 (Compl. ¶¶ 3, 20). He contends officers' post-arrest statements justifying the arrest "are *post hoc* decision-making which together indicate pretext." *Id.* at 53 (Compl. ¶ 213). But the Complaint's allegation of pretext is no better than conclusory. *See Iqbal*, 556 U.S. at 678. As discussed above, officers made statements contemporaneous with the arrest indicating

interference supplying probable cause at the time, not post hoc. *See* Doc. 1 at 41 (Compl. ¶ 153) (reciting body cam dialogue explaining to plaintiff he was under arrest for interfering).

Plaintiff also contends that officers provided multiple, purportedly conflicting reasons for his arrest—including moving plaintiff out of harm's way, behavior distracting to officers, refusing to leave the area, and ignoring officer commands. *Id.* at 2, 5–6 (Compl. ¶¶ 2, 20–21). But the officers' multiple justifications don't undermine probable cause. *First*, they don't conflict with one another—all can exist simultaneously. *Second*, each reason is consistent with the crime of interference. *See Brown*, 387 P.3d at 849 (explaining safety concerns interfere with law enforcement—like the need to move plaintiff out of harm's way here); *see id.* (finding passively impeding an officer interferes with law enforcement—like the distracting behavior here); *see Mosley*, 743 F.3d at 1330 (noting that failing to comply with lawful orders constitutes interference—like refusing to leave the area and ignoring officer commands here). Plaintiff hasn't persuaded the court that the officer defendants citing multiple reasons for plaintiff's arrest undermines probable cause.

So, plaintiff hasn't crossed the threshold of a retaliatory arrest claim because he hasn't shown an absence of probable cause.[2] Without shouldering his burden to show a constitutional violation has occurred, plaintiff's claim can't weather the officer defendants' qualified immunity

---

[2]     Plaintiff makes a passing argument that the probable cause requirement doesn't apply if similarly situated individuals—persons not engaged in protected speech—weren't arrested. Doc. 34 at 10, 10 n.8. The court addresses plaintiff's allegations regarding these other individuals in the context of plaintiff's retaliatory policy claim, below. *See* IV.B. The gist of the court's conclusion there is that plaintiff's allegations of similarly situated individuals are conclusory. Those conclusory allegations can't provide the "objective evidence" required to rely on *Gonzalez*'s narrow exception to the probable cause requirement. *See Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) ("[A]s a general rule, a plaintiff bringing a retaliatory-arrest claim must plead and prove the absence of probable cause for the arrest. At the same time, we [have] recognized a narrow exception to that rule. The existence of probable cause does not defeat a plaintiff's claim if he produces objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." (quotation cleaned up)).

defense.  The court thus dismisses plaintiff's retaliatory arrest claim against the officer
defendants.  Qualified immunity bars the claim.

### D.    Failure to Intervene

Plaintiff also brings a claim for failure to intervene.  Doc. 1 at 53–54 (Compl. ¶¶ 211–
22).  He contends that the officer defendants' failure to prevent his unlawful arrest violated his
Fourth Amendment right to freedom from unreasonable search and seizure.  *Id.* at 54 (Compl.
¶¶ 219–22).  Specifically, he asserts that at "any time during the interaction with [p]laintiff or the
subsequent booking process, [d]efendant McShane had the opportunity to intervene in use of
force and booking of plaintiff but failed to do so." *Id.* at (Compl. ¶ 220).  He also contends that
"Twite, Foster, and Shipley had the opportunity to intervene in [d]efendant McShane's unlawful
arrest of plaintiff but failed to do so." *Id.* (Compl. ¶ 219).  The court first recites the law for
stating a failure-to-intervene claim and then evaluates the claim against each group of officer
defendants—*first*, McShane, and *then* Twite, Foster, and Shipley.

"The Tenth Circuit has recognized 'that all law enforcement officials have an affirmative
duty to intervene to protect the constitutional rights of citizens from infringement by other law
enforcement officers in their presence.'" *Bledsoe v. Carreno*, 53 F.4th 589, 616 (10th Cir. 2022)
(quoting *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008)).  "A plaintiff
states a constitutional violation in the form of failure to intervene by alleging that 1) a
government officer violated his constitutional rights, 2) a different government actor (the
defendant) observed or had reasons to know about that constitutional violation, and 3) the
defendant had a realistic opportunity to intervene, but failed to do so." *Id.*  "Those elements
draw a distinction between the violating officer and the observing officer, and the latter is subject
to liability for a failure-to-intervene claim." *Spiehs v. Armbrister*, No. 24-4005-JAR-BGS, 2025
WL 548423, at *11 (D. Kan. Feb. 19, 2025).

The officer defendants identify two shortcomings with plaintiff's failure-to-intervene claim that, the officers assert, preclude him from clearing the first qualified immunity hurdle. Doc. 32 at 11–13. *First*, the officer defendants argue that plaintiff's failure-to-intervene claim against McShane "make[s] little sense" because plaintiff "seemingly argues that [d]efendant McShane should have intervened to stop his own actions." *Id.* at 12. The court agrees. As *Spiehs* clarified, the elements of a failure-to-intervene claim confer liability on "the observing officer," not "the violating officer[.]" 2025 WL 548423, at *11. Here, McShane is one of the "violating" officers. He was involved actively in plaintiff's arrest and the alleged use of excessive force. *See* Doc. 1 at 40–41 (Compl. ¶ 153). So, a failure-to-intervene claim doesn't lie against McShane.

*Second*, the officer defendants argue that there's no underlying constitutional violation to support a failure-to-intervene claim against Twite, Foster, and Shipley because the arrest wasn't unlawful.[3] Doc. 32 at 12. The court again agrees with defendants. "An unlawful arrest occurs when there is no probable cause to support the arrest." *Spiehs*, 2025 WL 548423, at *10 (citation omitted). And, the Supreme Court has recognized, a "warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). As outlined at length above, probable cause for the crime of interference supported plaintiff's arrest here. *See* § III.C. Plaintiff thus fails to establish the

---

[3]    To the extent that plaintiff intended to premise his claim against Twite, Foster, and Shipley on their failure to intervene in the use of excessive force, the same two barriers also prohibit that putative claim's success. *First*, the Complaint's allegations don't specify which officer defendants allegedly used excessive force. *See* § II, n.1, above. So, any or all of these three officers could assume the role of violating officer. A plaintiff may direct a failure-to-intervene claim only against an observing officer, not a violating officer. *Second*, even if some or all of these officers were the observing officers, no allegations establish that the use of force was excessive, so no constitutional violation satisfies the first failure-to-intervene element. *See* § III.E, below.

constitutional violation required to support a viable failure-to-intervene claim. *See Bledsoe*, 53 F.4th at 616 (reciting "a government officer violated his constitutional rights" as the first element). So, plaintiff's failure-to-intervene claim fails. As before, plaintiff fails to sustain his burden in the face of a qualified immunity defense on the first prong. Qualified immunity bars this claim, as well, and the court dismisses it against all officer defendants. Now, the court moves on to plaintiff's third claim.

### E.    Excessive Force

Plaintiff asserts excessive force under two alternative theories—one applies if probable cause didn't support plaintiff's arrest, and one applies even if it did. Doc. 1 at 55 (Compl. ¶¶ 225–28). Because the court already determined probable cause supported plaintiff's arrest, *see* § III.C., the court only need consider the second theory. Under that theory, plaintiff contends that "the force was not reasonably proportionate to the need for that force given the totality of the circumstances facing the defendant Officers[.]" Doc. 1 at 55 (Compl. ¶ 229). Plaintiff alleges the force included "the unwarranted aggressive grabbing of [plaintiff's] arms, pain pressure maneuvers, and twisting of fingers" accompanied by restraining plaintiff and restricting his movement. *Id.* at 56 (Compl. ¶ 231). And this use of force, plaintiff contends, deprived him of his constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.[4] *Id.* at 58 (Compl. ¶¶ 244, 246).

---

[4]    The officer defendants argue that the court need consider plaintiff's excessive force claim solely under the Fourth Amendment here. Doc. 32 at 13. That's so, the officer defendants contend, because courts analyze excessive force claims arising in the context of an arrest—like here—strictly under the Fourth Amendment. *Id.* (citing *Estate of Holmes ex rel. Couser v. Somers*, 387 F. Supp. 3d 1233, 1249 (D. Kan. 2019)). Courts reserve excessive force analyses under the other named Amendments for other contexts, the officer defendants assert. *See id.* (explaining Fourteenth Amendment claims apply to pretrial detainees (quoting *Estate of Holmes*, 387 F. Supp. 3d at 1249)); *id.* (noting Eighth Amendment claims apply solely to convicted prisoners (citing *Byers v. Smith*, No. 20-cv-03107-HLT, 2020 WL 6077420, at *2 (D. Kan. Oct. 15, 2020)); *id.* (asserting Fifth Amendment only applies to actions taken by federal government (citing *Williams v. Bd. Cnty. Comm'rs*, No. 06-2055-KHV, 2006 WL 2385342, at *3 (D. Kan. Aug. 17, 2006))). Plaintiff never responds to this argument. *See generally* Doc. 34. The court

A claim that law enforcement officers have used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. *County of Los Angeles v. Mendez*, 581 U.S. 420, 427 (2017); *Estate of Larsen ex. rel. Sturdivan v. Murr*, 511 F.3d 1255, 1259 (10th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (further citation and internal quotation marks omitted)). When performing this analysis, the court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

"The *Graham* test asks if the officers' actions were objectively reasonable and recognizes that officers need to make split-second judgments. A small amount of force, like grabbing a suspect and placing him in the patrol car, is permissible in effectuating an arrest under the Fourth Amendment." *Donahue v. Wihongi*, 948 F.3d 1177, 1196 (10th Cir. 2020) (quotation cleaned up). And "a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007) (en banc). "The Tenth Circuit has recognized that the absence of a serious injury is relevant to the excessive force analysis, and that the extent of the injury 'may . . . provide some indication of the amount

---

agrees with the officer defendants. *See Porro v. Barnes*, 624 F.3d 1322, 1325–26 (10th Cir. 2010) (outlining which amendment applies to excessive force claim based on "where the defendant finds himself in the criminal justice system" and concluding Fourth Amendment "pertains to the events leading up to and including an arrest of a citizen previously at liberty"). The court thus dismisses plaintiff's claims based on the Fifth, Eighth, and Fourteenth Amendments and considers here excessive force solely under the Fourth Amendment.

of force applied.'" *McGregor v. City of Neodesha*, No. 22-1033-EFM, 2022 WL 6728149, at *5 (D. Kan. Oct. 11, 2022) (ellipses in original) (quoting *Marshall v. Milyard*, 415 F. App'x 850, 853 (10th Cir. 2011)). De minimus force includes that which is "limited, temporary, and left no substantial injury." *Id.* In *Valencia v. De Luca*, the Tenth Circuit agreed with the district court's analysis that "pulling on [plaintiff], using pressure points, and twisting his wrist and arm" was reasonable force, even though plaintiff there was a minor. 612 F. App'x 512, 519 (10th Cir. 2015). In reaching that conclusion, our Circuit noted that "the amount of force used was minimal in comparison with more drastic techniques, such as the use of pepper spray, tasers, or batons[.]" *Id.*

Here, the amount of force plaintiff alleges was reasonable under *Graham*'s standard. To be sure, the *Graham* test suggests minimal force is appropriate in these circumstances. Plaintiff alleges that he was unarmed and didn't engage in hostile actions toward the officers. Doc. 1 at 56 (Compl. ¶¶ 232–33). Indeed, he tried to move away from McShane. Doc. 1 at 28 (Compl. ¶ 111). Plaintiff also argues that there "is no evidence that [he] actively resisted arrest. He never attempted to flee." Doc. 34 at 13. Naturally, the court is cognizant of the inherent danger to officers given the active shooter situation, which plaintiff arguably compounded with his alleged interference. And plaintiff was charged with a felony, not a misdemeanor. *See Donahue*, 948 F.3d at 1197 (finding first *Graham* factor favors minimal force when "crimes at issue were misdemeanors"). Under Kan. Stat. Ann. § 21-5904(b)(5)(A), interference is a severity level 9, nonperson felony. So, on the whole, the *Graham* factors suggest some minimal force is reasonable.

Even the force alleged in the Complaint is minimal. He alleges the officer defendants used "body and neck restraints, bending of the wrists and twisting of" plaintiff's fingers while

arresting him.  Doc. 1 at 39 (Compl. ¶ 149).  But plaintiff provides no facts supporting a finding

of any injury other than a de minimus one.  *See generally* Doc. 1; *see also Marshall*, 415 F.

App'x at 854 ("[A]llegations of de minimus force simply fall short of what is required to

establish a constitutional violation.").  Recall, too, that a "small amount of force . . . is

permissible" when "effectuating an arrest."  *Donahue*, 948 F.3d at 1196 (quotation cleaned up).

The amount of force plaintiff alleges falls into the permissible category.  *See, e.g.*, *Donahue*, 948

F.3d at 1197 (finding one officer pulling arrestee up and two officers pulling arrestee's arms

back and handcuffing him constituted minimal force); *Valencia*, 612 F. App'x at 519

(concluding pulling, pressure points, and twisting were reasonable force); *McGregor*, 2022 WL

6728149, at *5 (finding "limited, temporary" force that "left no substantial injury" didn't support

constitutional violation).  The court thus concludes the force plaintiff alleges didn't exceed what

is reasonable to effectuate a lawful arrest under the circumstances plaintiff alleges here.

Plaintiff's excessive force claim thus falls short of what the law requires.  And without

sufficient allegations to allege a constitutional violation, plaintiff fails to shoulder his qualified-

immunity burden at the first prong.  So, the court holds, qualified immunity bars plaintiff's

excessive force claim and the court dismisses it against all officer defendants.

### F.    Malicious Prosecution under 42 U.S.C. § 1983

Finally, plaintiff brings a claim for malicious prosecution under § 1983 against the officer

defendants.  But, the officer defendants argue, the court needn't engage in a detailed analysis of

this claim.  Doc. 32 at 16.  That's so because plaintiff can't meet the second element required for

such a claim—a favorable outcome for plaintiff in the underlying action.  *Id.*  Plaintiff never

responds to this argument.  *See generally* Doc. 34.

"A malicious prosecution claim brought under the Fourth Amendment requires a showing

that (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the

original action terminated in favor of the plaintiff; (3) no probable cause supported the original

arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the

plaintiff sustained damages." *Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014)

(internal quotation marks and citation omitted).

Here, both the copy of the state court criminal docket attached to the officer defendants'

motion, Doc. 32-2 at 1 (Ex. B),[5] and the court's independent research confirm that plaintiff's

criminal case for felony interference with law enforcement remains pending, *see* Kansas District

Court Access Portal, https://prodportal.kscourts.gov/ProdPortal/ (last visited Mar. 22, 2025)

(showing plaintiff's state court criminal case, DG-2023-CR-000525, remains "pending").

Plaintiff thus can't satisfy the favorable result element of a malicious prosecution claim. This

failure means that plaintiff didn't overcome the first prong to challenge the officer defendants'

qualified immunity defense, once again. And the court dismisses plaintiff's malicious

prosecution claim against all officer defendants as barred by qualified immunity.

Because the court dismisses all claims asserted against all officer defendants, it needn't

reach defendants' arguments about fair notice. *See* Doc. 32 at 4. It does, however, have one

final issue to evaluate before moving to the city's Motion to Dismiss: attorneys' fees.

---

[5]     In considering the officer defendants' motion, the court can consider documents subject to
judicial notice. The officer defendants ask this court to take judicial notice of plaintiff's state court
criminal docket, a copy of which they attach as an exhibit. *See* Doc. 32-2 (Ex. B). The court properly can
take judicial notice of these proceedings. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*,
605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of
proceedings in other courts, both within and without the federal judicial system, if those proceedings have
a direct relation to matters at issue."); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts
subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to
dismiss into a motion for summary judgment." (citation omitted)).

### G.    Attorneys' Fees

The officer defendants request an award of attorneys' fees under 42. U.S.C. § 1988.  Doc. 32 at 19; Doc. 39 at 9.  Plaintiff never responds to this request.  *See generally* Doc. 34.

"Our legal system generally requires each party to bear his own litigation expenses, including attorney's fees, regardless whether he wins or loses." *Fox v. Vice*, 563 U.S. 826, 832 (2011).  The officer defendants invoke 42 U.S.C. § 1988(b), which allows the award of "a reasonable attorney's fee" to "the prevailing party" in a § 1983 suit.  When the defendant prevails, "§ 1988 authorizes a district court to award attorney's fees to a defendant 'upon a finding that the plaintiff[s'] action was frivolous, unreasonable, or without foundation.'" *Fox*, 563 U.S. at 833 (quoting *Christiansburg Garmet Co. v. EEOC*, 434 U.S. 412, 421 (1978)).

The officer defendants never argue—much less establish—that plaintiff's action was frivolous, unreasonable, or without foundation.  *See generally* Doc. 32; *see generally* Doc. 39.  Nor is it evident that defendants have complied with D. Kan. Rule 54.2, which provides the procedural framework for requesting attorneys' fees in our court.  So, the court denies the officer defendants' request for costs and attorneys' fees under § 1988.  Doc. 32 at 19; Doc. 39 at 9.

Having wrapped up plaintiff's claims against the officer defendants, the court turns next to plaintiff's claims against the City Commission of Lawrence, and the city's dismissal arguments.

## IV.    The City's Motion to Dismiss (Doc. 7)

Plaintiff also asserts claims against the City Commission of Lawrence—based on the same felony arrest event—under 42 U.S.C. § 1983.  Recall that § 1983 "requires (1) deprivation of a federally protected right by (2) an actor acting under color of state law." *Fowler*, 104 F.4th at 797 (internal quotation marks and citation omitted).  Plaintiff contends that the city deprived him of his First Amendment right to "photograph, to record matters of public interest, observe

governmental operations, and even the commission of a crime." Doc. 1 at 47 (Compl. ¶ 178) (citing *Project Veritas v. Schmidt*, 72 F.4th 1043, 1065 (9th Cir. 2023)). Also, he argues the Lawrence Police Department (LPD)'s policy addressing recording police activities amounts to a prior restraint on speech. *Id.* (Compl. ¶ 181). He also alleges that the policy is retaliatory because officer defendants singled him out to chill his speech. *Id.* at 50 (Compl. ¶ 191). Finally, plaintiff asserts that the city failed to train and supervise its police officers. *Id.* at 60 (Compl.) (Count VI). Because any attempt to assert liability against a municipality necessarily starts with *Monell*, the court explains it, next.

### A.    Municipal Liability under *Monell*

A plaintiff may not assert a 42 U.S.C. § 1983 claim against a municipal entity unless he establishes that a government policy or custom caused his injuries. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). Municipal liability is limited to those situations "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* at 694. To establish municipal liability under § 1983, "'a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct causal link between the policy or custom and the injury alleged.'" *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quoting *Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)). A plaintiff may establish such municipal policy or custom by alleging facts capable of demonstrating one of the following:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or

supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Id.* (internal quotation marks, brackets, and citation omitted). To survive a motion to dismiss, a plaintiff "must allege sufficient facts to show that a specific policy or custom was the moving force behind the alleged violation." *Dalcour v. City of Lakewood*, 492 F. App'x 924, 930 (10th Cir. 2012) (citation omitted).

Here, plaintiff invokes the first (formal regulation or policy statement) and fifth (failure to train adequately) bases for imposing *Monell* liability. Under the first, plaintiff recites a formal LPD policy and contends it amounts to prior restraint and a retaliatory policy. Under the fifth, plaintiff recounts alleged failures of the officer defendants at the scene of his felony arrest and argues those failures arose from inadequate training or supervision. The court begins by analyzing the LPD's formal policy.

### B.    Prior Restraint and Retaliatory Policy

The Complaint invokes LPD policy to allege *Monell* liability in two ways: prior restraint and retaliatory policy.[6] Take them in turn.

*First*, plaintiff alleges that the LPD's policy is a form of prior restraint. Doc. 1 at 47 (Compl. ¶ 181). "Generally, a prior restraint restricts speech in advance on the basis of content and carries a presumption of unconstitutionality." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (quotation cleaned up). "In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of

---

[6]    The Complaint also alleges that the city's failure to take remedial action after a constitutional violation allows the court to infer a policy or custom supporting *Monell* liability. Doc. 1 at 50 (Compl. ¶¶ 195–96). Given that the court has concluded no constitutional violation occurred, it needn't reach this theory of municipal liability.

contempt." *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1193 (D.N.M. 2024) (internal quotation marks and citation omitted).  "[A]n administrative licensing scheme . . . . requires a speaker to obtain approval before engaging in certain forms of speech in a given forum . . . . A typical example . . . required citizens to obtain a permit before holding a parade or assembly on public property." *Taylor*, 713 F.3d at 42 (citation omitted).  "A judicial injunction is usually a court order forbidding specific speakers from specific expression." *Id.*  In evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Here, the Complaint recites the following LPD policy, and plaintiff asserts his prior restraint and retaliatory policy claims on it:

> Members of the public who wish to record law enforcement activities are limited only in certain aspects.
> (a) Recordings may be made from any public place or any private property where the individual has the legal right to be present.
> (b) Beyond the act of photographing or recording, individuals may not interfere with the law enforcement activity.  Examples of interference include, but are not limited to:
> > 1. Tampering with a witness or suspect.
> > 2. Inciting others to violate the law.
> > 3. Being so close to the activity as to present a clear safety hazard to the officers.
> > 4. Being so close to the activity as to interfere with an officer's effective communication with a suspect or witness.
> (c) The individual may not present an undue safety risk to the officer, him/herself or others.

Doc. 1 at 48 (Compl. ¶ 183) (quoting Lawrence Police Department Policy Manual 425.3).  This policy doesn't match either of the prior restraint "classic forms:  judicial injunctions and administrative licensing schemes." *Taylor*, 713 F.3d at 42.  The policy isn't directed at an individual, like a judicial injunction, *id.*, and it doesn't require pre-approval by a permit or

license, *Voter Reference Found.*, 727 F. Supp. 3d at 1193. Nor does it restrict speech based on

its content. *Taylor*, 713 F.3d at 42. These considerations alone suggest plaintiff can't state a

prior restraint claim based on the LPD policy. But, even if it qualifies as a prior restraint, it

would survive the constitutionality test, as explained next.

Plaintiff alleges that the City Commission of Lawrence, through this policy, "empowers

its officers to engage in limiting First Amendment conduct simply because the citizen is

recording." Doc. 1 at 48 (Compl. ¶ 182). The city responds that the right to record isn't absolute

and argues the restrictions are reasonable. Doc. 8 at 8. Recall that the right to film police while

they're performing their duties is subject to time, place, and manner restrictions. *Irizarry*, 38

F.4th at 1292 n.10. And the appropriateness of those time, place, and manner restrictions turns

largely on whether an individual "interfere[s] with the police officers' performance of their

duties," *id.* (quotation cleaned up), and whether the filming occurs "from a comfortable remove,"

*Glik*, 655 F.3d at 84 (quotation cleaned up). "It is well-settled that even in a public forum the

government may impose reasonable restrictions on the time, place, and manner of protected

speech, provided the restrictions are justified without reference to the content of the regulated

speech, that they are narrowly tailored to serve a significant governmental interest, and that they

leave open ample alternative channels for communication of information." *McCraw v. City of

Oklahoma City*, 973 F.3d 1057, 1070 (10th Cir. 2020) (internal quotation marks and citations

omitted).

Here, the policy at issue aligns with reasonable restrictions, as the city argues. Doc. 8 at

8. For example, it prohibits the recorder from interfering and lingering "so close to the activity

as to present a clear safety hazard[.]" Doc. 1 at 48 (Compl. ¶ 183). An officer's ability to

complete his duties without interference and maintain safety is significant enough to justify the

restrictions. *See McCraw*, 973 F.3d at 1070. What's more, the policy limits recording "only in certain aspects." Doc. 1 at 48 (Compl. ¶ 183). Such narrow tailoring also suggests the policy's restrictions are reasonable.

The court thus concludes plaintiff fails to state a § 1983 claim against the city premised on prior restraint. Plaintiff hasn't alleged plausibly that the LPD policy is a prior restraint. And, even if it were, plaintiff hasn't alleged plausibly that it serves as a "direct causal link between the policy . . . and the injury[.]" *Bryson*, 627 F.3d at 788 (quotation cleaned up). Execution of LPD's recording policy doesn't inflict the "injury alleged" because the policy only imposes reasonable—not unconstitutional—restrictions. *Id.*

*Second*, plaintiff argues that the LPD policy is retaliatory because the officer defendants singled him out due to his recording. Doc. 1 at 50 (Compl. ¶¶ 191, 193). Meanwhile, the Complaint alleges officer defendants allowed other individuals to remain on the property. *Id.* (Compl. ¶ 193). So, plaintiff alleges, the officer defendants used the policy as a way "to retaliate and chill [plaintiff's] speech." *Id.* (Compl. ¶ 191). But these are conclusory allegations, as explained below. And even if they weren't, they don't support a retaliatory policy allegation. "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018). Here, plaintiff alleges no more than an on-the-spot officer's decision, rather than a "long term and pervasive" retaliation against individuals who record police activity. *Id.*

Also, plaintiff's allegations about other individuals on the property are conclusory. Recall that probable cause supported plaintiff's arrest because he ignored law enforcement instructions and distracted them by presenting additional safety concerns. To demonstrate

retaliation, plaintiff must allege that the other individuals on the scene were acting in a fashion similar to him. But here plaintiff never alleges that any other individuals ignored law enforcement's instructions. Nor does he allege anything about the proximity of other individuals to the active shooter's residence. He doesn't even allege that these other individuals *weren't* filming on their cell phones. He simply says that "defendants allowed other individuals to be present on the same private property." Doc. 1 at 50 (Compl. ¶ 193). That allegation just doesn't cut it.

The court concludes plaintiff's allegation of a § 1983 claim premised on retaliatory policy likewise fails to state a claim. Plaintiff hasn't alleged a "long term and pervasive" retaliatory approach. *Lozman*, 585 U.S. at 100. Nor has plaintiff alleged "sufficient facts to show that" LPD's policy—and not plaintiff's criminal interference—was "the moving force behind the alleged violation." *Dalcour*, 492 F. App'x at 930 (citation omitted).

### C.    Failure to Train and Supervise

Finally, plaintiff alleges the city is liable under *Monell* because it failed to train and supervise. Doc. 1 at 60–67 (Compl. ¶¶ 256–89). To invoke this method of demonstrating municipal policy or custom, a plaintiff must show either "a pattern of prior similar misconduct" or that the need for training was "so obvious" and the current training's inadequacy "so likely to result in the violation of constitutional rights" that policymakers demonstrated deliberate indifference. *Waller v. City and County of Denver*, 932 F.3d 1277, 1288 (10th Cir. 2019) (citation and internal quotation marks omitted). Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and citations omitted). And, while "a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official

government policy[,]" this failure-to-train theory is the "most tenuous" theory which can support

municipal liability because it is "nebulous" and "removed from the constitutional violation." *Id.*

(internal quotation marks and citation omitted).

Here, plaintiff asserts a failure to train and supervise claim premised on the officer

defendants' alleged failure to

- de-escalate the situation, Doc. 1 at 61 (Compl. ¶ 260),

- handle plaintiff's presence at the scene properly, *id.* at 62–63 (Compl. ¶ 267),

- communicate with plaintiff, *id.*,

- communicate with the command structure, *id.* at 63 (Compl. ¶ 271),

- secure the scene and establish a viable security perimeter, *id.* at 64 (Compl. ¶ 273), and

- protect plaintiff once detained, *id.*

But here's the problem. Plaintiff never alleges "a pattern of prior similar misconduct[.]"

*Waller*, 932 F.3d at 1288 (citation and internal quotation marks omitted). He focuses solely on

this single incident involving him.[7] In short, he must allege facts to demonstrate deliberate

---

[7]    In his Response, plaintiff asserts that this "is not the first incident regarding the Lawrence Police Department policies of arrest and excessive use of force." Doc. 19 at 8. To support this assertion, however, plaintiff first refers to an ongoing case—brought by plaintiff's counsel here—which has pending motions to dismiss for failure to state a claim and which is under a stay of discovery. *Id.* (citing *Anthony v. Ashley et al.*, No. 24-cv-4034-JWB-BGS (D. Kan. 2024)); *see also Kennon v. Ashley*, No. 24-4034-JWB-BGS, 2024 WL 4826901, at *3 (D. Kan. Nov. 19, 2024) (staying discovery pending ruling on motions to dismiss). That's not evidence of a pattern—that's merely evidence of allegations in another case plaintiff's counsel is working on currently. Then, plaintiff refers to *Calvo-Pino v. Weidl*, presumably to encourage the court to "stack inference upon inference" to show the city's unconstitutional practice. Doc. 19 at 8 (quoting *Calvo-Pino v. Weidl*, 514 F. Supp. 3d 1321, 1327 (D. Kan. 2021)). But the allegations here, the court has concluded, fail to state a constitutional violation. So, inference stacking isn't appropriate here. And to the extent plaintiff intended *Calvo-Pino* to support evidence of a pattern, it doesn't. *Calvo-Pino* involved the Lawrence Police Department, but relies on categorically different allegations of prolonging traffic stops in violation of the Fourth Amendment. 514 F. Supp. 3d at 1329. And the court there found no pattern of similar misconduct. *Id.* Even if these cases offered some support for plaintiff's assertion of a pattern, plaintiff didn't include any such allegations in his Complaint here. *See generally* Doc. 1. So, the court evaluates plaintiff's claim under a deliberate indifference standard.

indifference.  But, as the city notes, he hasn't.  Doc. 8 at 14.  He alleges no facts to suggest that the city "disregarded a known or obvious consequence of [its] action."  *Connick*, 563 U.S. at 61 (internal quotation marks and citations omitted).  Plaintiff doesn't allege anything about the city's training program or supervisory approach.  There are no allegations that the city has engaged in a pattern of handling individuals recording police activities improperly.  Indeed, plaintiff's response to this argument is telling.  Plaintiff copied and pasted pages of allegations from his Complaint that, he asserts, support his failure-to-train claim.  Doc. 19 at 3–5.  But all those allegations come from the incident involving him, on May 20, 2023.  *Id.*  None of the identified allegations allege anything about the city or its training of officers except for that one day.  *Id.*  And, when he explains what the city failed to train, he repeatedly suggests the paucity of training is "evidenced . . . by defendant McShane."  *Id.* at 5–6.  Plaintiff simply identifies one incident—focusing mainly on one officer defendant—and then asks the court to assume any failures by McShane on that day demonstrate indifference.  But the deliberate indifference standard is "stringent."  *Connick*, 563 U.S. at 61.  And identifying just one incident—without any other supporting allegations—just isn't enough to survive on this "tenuous" theory of liability. *Id.*

The court thus dismisses plaintiff's § 1983 claim premised on a failure to train or supervise.  Given this conclusion, the court's work is done and it needn't reach the city's arguments about Rule 8.  *See* Doc. 8 at 5.

## V.    Conclusion

Plaintiff failed to shoulder his burden—in response to the officer defendants' qualified immunity defense—to show that a constitutional violation occurred.  And so, qualified immunity bars all four claims against the officer defendants, and the court dismisses them without

33

prejudice. Plaintiff also failed to state a § 1983 claim against the city under either *Monell*

liability theory. The court thus dismisses these claims, as well, without prejudice.

> **IT IS THEREFORE ORDERED BY THE COURT THAT** defendants David

McShane, Meagan Shipley, Grant Foster, and Austin Twite's Motion to Dismiss (Doc. 31) is

granted. Defendants David McShane, Meagan Shipley, Grant Foster, and Austin Twite's request

for attorneys' costs and fees is denied.

> **IT IS FURTHER ORDERED THAT** defendant City Commission of Lawrence,

Kansas's Motion to Dismiss (Doc. 7) is granted.

> **IT IS FURTHER ORDERED THAT** the Clerk of the Court shall enter judgment

consistent with this Order.

> **IT IS SO ORDERED.**

> **Dated this 26th day of March, 2025, at Kansas City, Kansas.**

> > **s/ Daniel D. Crabtree**
> > **Daniel D. Crabtree**
> > **United States District Judge**